806 S.E.2d 82

The PROTESTANT EPISCOPAL CHURCH IN THE DIOCESE OF SOUTH CAROLINA; The Trustees of The Protestant Episcopal Church in South Carolina, a South Carolina Corporate Body; All Saints Protestant Episcopal Church, Inc.; Christ St. Paul's Episcopal Church; Christ the King, Waccamaw; Church of The Cross, Inc. and Church of the Cross Declaration of Trust; Church of The Holy Comforter; Church of the Redeemer; Holy Trinity Episcopal Church; Saint Luke's Church, Hilton Head; St. Matthews Church; St. Andrews Church-Mt. Pleasant Land Trust; St. Bartholomews Episcopal Church; St. David's Church; St. James' Church, James Island, S.C.; St. John's Episcopal Church of Florence, S.C.; St. Matthias Episcopal Church, Inc.; St. Paul's Episcopal Church of Bennettsville, Inc.; St. Paul's Episcopal Church of Conway; The Church of St. Luke and St. Paul, Radcliffeboro; The Church of Our Saviour of the Diocese of South Carolina; The Church of the Epiphany (Episcopal); The Church of the Good Shepherd, Charleston, SC; The Church of The Holy Cross; The Church of The Resurrection, Surfside; The Protestant Episcopal Church of The Parish of Saint Philip, in Charleston, in the State of South Carolina; The Protestant Episcopal Church, The Parish of Saint Michael, in Charleston, in the State of South Carolina and St. Michael's Church Declaration of Trust; The Vestry and Church Wardens of St. Jude's Church of Walterboro; The Vestry and Church Wardens of The Episcopal Church of The Parish of Prince George Winyah; The Vestry and Church Wardens of The Church of The Parish of St. Helena and The Parish Church of St. Helena Trust; The Vestry and Church Wardens of The Parish of St. Matthew; The Vestry and Wardens of St. Paul's Church, Summerville; Trinity Church of Myrtle Beach; Trinity Episcopal Church; Trinity Episcopal Church, Pinopolis; Vestry and Church Wardens of the Episcopal Church of The Parish of Christ Church; Vestry and Church Wardens of The Episcopal Church of the Parish of St. John's, Charleston County, The Vestries and Churchwardens of The Parish of St. Andrews, Respondents.

v.

The EPISCOPAL CHURCH (a/k/a The Protestant Episcopal
Church in the United States of America) and The Episcopal
Church in South Carolina, Appellants.

**Appellate Case No. 2015-000622**
**Opinion No. 27731**

Supreme Court of South Carolina.

Heard September 23, 2015
Filed August 2, 2017
Rehearing Denied November 17, 2017

Allan R. Holmes, Sr. and Timothy O. Lewis, both of Gibbs & Holmes, of Charleston, David Booth Beers and Mary E. Kostel, both of Goodwin Procter, LLP, of Washington, DC, Blake A. Hewitt and John S. Nichols, both of Bluestein Nichols Thompson & Delgado, of Columbia, Thomas S. Tisdale and Jason S. Smith, both of Hellman Yates & Tisdale, of Charleston and R. Walker Humphrey, II, of Waters & Kraus, of Dallas, Texas, for Appellants.

C. Alan Runyan and Andrew S. Platte, both of Speights & Runyan, of Beaufort, Henrietta U. Golding and Amanda Bailey, both of McNair Law Firm, of Myrtle Beach, C. Mitchell

Brown, of Nelson, Mullins, Riley & Scarborough, of Columbia, Charles H. Williams, of Williams & Williams, of Orangeburg, David Cox, of Barnwell Whaley Patterson & Helms, of Charleston, Thomas C. Davis, of Harvey & Battey, of Beaufort, Harry Easterling, Jr., of Bennettsville, G. Mark Phillips, of Nelson, Mullins, Riley & Scarborough, of Charleston, W. Foster Gaillard and Henry Grimball, both of Womble, Carlyle, Sandridge & Rice, of Charleston, Keith McCarty, of McCarty Law Firm, of Charleston, William A. Scott, of Pedersen & Scott, of Charleston, Mark Evans, of Charleston, David B. Marvel and David L. DeVane, both of Prenner Marvel, of Charleston, John Furman Wall, III, of Mt. Pleasant, Allan P. Sloan, III and Joseph C. Wilson, IV, both of Pierce, Herns, Sloan & Wilson, of Charleston, C. Pierce Campbell, of Turner, Padget, Graham & Laney, of Florence, Robert R. Horger, of Horger, Barnwell & Reid, of Orangeburg, Saunders M. Bridges, of Aiken Bridges Elliott Tyler & Saleeby, of Florence, Lawrence B. Orr, of Orr Elmore & Ervin, of Florence, Francis M. Mack, of St. Matthews, Robert S. Shelton, of The Bellamy Law Firm, of Myrtle Beach, William A. Bryan, of Bryan & Haar, of Surfside Beach, Harry Oxner, of Oxner & Stacy, of Georgetown, Susan MacDonald and Jim Lehman, both of Nelson, Mullins, Riley & Scarborough, of Myrtle Beach, Brandt Shelbourne, of Shelbourne Law Firm, of Summerville, Stephen S. McKenzie, of Coffey, Chandler & Kent, of Manning, John B. Williams, of Williams & Hulst, of Moncks Corner, George J. Kefalos and Oana D. Johnson, both of George J. Kefalos, P.A., of Charleston, Stephen Spitz, of Charleston and Thornwell F. Sowell, III and Bess J. Durant, both of Sowell Gray Stepp & Lafitte, LLC, of Columbia, for Respondents.

## ACTING JUSTICE PLEICONES:

This is an appeal from a circuit court order holding that the Appellants have no legal or equitable interests in certain real and personal property located in South Carolina, and enjoining the Appellants from utilizing certain disputed service marks and names. In this lead opinion I explain why I would reverse the entire order.

The Respondents are the Protestant Episcopal Church in the Diocese of South Carolina (Disassociated Diocese); the Trustees of the Protestant Episcopal Church in South Carolina (Trustees); and thirty-six individual parishes that have aligned themselves with the Disassociated Diocese (Parishes). The Appellants are The Episcopal Church a/k/a The Protestant Episcopal Church in the United States of America (TEC) and The Episcopal Church in South Carolina, the diocese that remains affiliated with the TEC (Associated Diocese).

After a lengthy bench trial, and based upon the application of "neutral principles of law," the circuit court found in favor of the Respondents on both the property and the service mark causes of action. Since the main purposes of this suit were requests for declaratory judgments and injunctive relief, I find that it sounds in equity.[1] *Doe v. S.C. Med. Mal. Liab. Joint Underwriting Ass'n*, 347 S.C. 642, 557 S.E.2d 670 (2001). The Court is therefore free to take its own view of the facts. *Id.*

As noted above, much of the trial judge's decision making in this case was controlled by her interpretation of the "neutral principles of law" approach to deciding ecclesiastical disputes. *See Pearson v. Church of God*, 325 S.C. 45, 478 S.E.2d 849 (1996) (adopting this approach). Specifically, she was guided by her reading of this Court's decision in *All Saints Parish Waccamaw v. The Protestant Episcopal Church in the Dio-*

---

1. Acting Justice Toal maintains that because the declarations made in this case will determine the rightful ownership of property, the main purpose of this suit is legal. I, however, look not to the first paragraph of the complaint, but rather to the prayer for relief, which seeks a declaration (1) which of the competing entities is the true diocese, (2) that respondents' legal title to property trumps appellants' equitable claims, and (3) for other injunctive relief related to trade names. The main purpose is to enjoin appellants from "interfering" with the respondents in "church matters" and thus this suit sounds in equity. *Compare, e.g., Williams v. Wilson*, 349 S.C. 336, 563 S.E.2d 320 (2002). To the extent the issues turn on property rights, the results turn on the validity and existence of certain trusts, matters which also sound in equity. *E.g., Settlemeyer v. McCluney*, 359 S.C. 317, 596 S.E.2d 514 (Ct. App. 2004). Were Acting Justice Toal correct, and were the Court to find the main purpose of this suit were legal, then the Court would be compelled to reverse and remand for a new trial given the number of erroneous and prejudicial evidentiary rulings made by the trial judge and raised to us on appeal. I note none of the opinions that would uphold the trial court's order in whole or in part address these issues.

*cese of South Carolina*, 385 S.C. 428, 685 S.E.2d 163 (2009) (*All Saints*). In the trial judge's view, the admissibility of evidence and the resolution of the property disputes at issue here were properly adjudicated solely on the basis of state corporate, property, and trust law, and she was required to ignore the ecclesiastical setting in which these disputes arose. This error of law led, in turn, to a distorted view of the issues in this case.

Before discussing the merits of the appeal, I briefly review a simplified history of TEC, and the church's history in South Carolina. I next address, and would reverse, the circuit court's finding that TEC is a congregational rather than a hierarchical church. I then address misperceptions of the "neutral principles of law" approach resulting in large part from the trial court's reading of *All Saints*, which I would now overrule in part.[2] I conclude that the present property and church governance disputes are not appropriate for resolution in the civil courts and would reverse the order to the extent it purports to resolve these questions. Finally, I find the trial court erred in holding that the Respondents' state-registered trademarks prevail over TEC's federally-protected trademarks, and therefore would also reverse that portion of the order.

### HISTORY

The Episcopal Church has a long history in South Carolina. *See All Saints, supra.* In 1789, four years after its formation, the Protestant Episcopal Church in South Carolina (South Carolina Diocese) and six other dioceses came together to form the national church (TEC). The South Carolina Diocese was voluntarily associated with TEC since that date, save for a five-year hiatus surrounding the Civil War. In 1841, Article 1 was added to the South Carolina Diocese's Constitution. This article, titled, "Of acceding to the constitutions and canons of the general convention," provided "The [South Carolina Dio-

---

**2.** Acting Justice Toal misreads my opinion as retitling property owned by All Saints Waccamaw, ousting its vestry, and rewriting its charter. It is unclear to me how Acting Justice Toal derives that conclusion as that congregation is not a party to this suit.

cese] accedes to, recognizes and adopts the general constitution and canons of [TEC] and acknowledges their authority accordingly." Similar language in which the Diocese acceded to TEC remained in the Diocese's governing documents until 2010. Further, for more than 200 years, a parish had to agree to conform to TEC's Constitution and Canons as well as those of the Diocese in order to become and remain a member of the South Carolina Diocese. Finally, the Trustee Corporation, which purports to be represented in this suit by the respondent Trustees, was chartered as a non-profit corporation in 1880 and again in 1902.

In 1923, after requesting permission from TEC to divide the state into two Dioceses, TEC's General Convention agreed to the division and the state was divided into the Upper and Lower Dioceses of South Carolina. The Lower Diocese was incorporated in 1973, with this corporate purpose: "[T]o continue an Episcopal Diocese under the Constitution and Canons of [TEC]." Both the Disassociated Diocese and the Associated Diocese claim to be the successor to the Lower Diocese.

Overly simplified, the issue in this case is whether respondent Disassociated Diocese, the Trustees, and the Parishes or appellant Associated Diocese and its parishes "own" the real, personal, and intellectual property that the Appellants allege was held in trust for the benefit of TEC in 2009.

## I. TEC Organization

In *All Saints,* the Court reiterated its previous definitions of a congregational and a hierarchical church structure: "A congregational church is an independent organization, governed solely within itself..., while a hierarchical [or ecclesiastical] church may be defined as one organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *All Saints,* 385 S.C. at 443, 685 S.E.2d at 171 fn. 9 (quoting *Seldon v. Singletary,* 284 S.C. 148, 149, 326 S.E.2d 147, 148 (1985)).

TEC is an unincorporated association comprised of subunits known as dioceses. Each diocese is, in turn, comprised of congregations known as parishes or missions. Every three

years, TEC sponsors a General Convention to which each diocese's standing committee sends a specified number of clerical and lay representatives to conduct TEC's business, including electing and confirming [3] new bishops.

The evidence in the record demonstrates TEC's organization is three-tiered, with the General Convention at the top, approximately one hundred dioceses created along geographical lines in the middle, and the individual parishes and missions affiliated with a particular diocese forming in the bottom tier. TEC is led by a Presiding Bishop, and each diocese is traditionally led by a bishop. The record establishes that the ultimate authority in TEC rests with the General Convention, and that the written sources of authority include TEC's Constitution and Canons, the Book of Common Prayer, and the Holy Bible. As noted above, until 2010, the Lower Diocese explicitly acceded to TEC's authority, and accession to both the Diocese and TEC was required of all parishes and missions. Further, until 2010, the Trustees' corporate bylaws stated it would carry out its duties under the authority of TEC's Constitution and Canons.

I find, based upon the evidence in this record, that TEC is a hierarchical church, and would therefore overrule the trial court's finding that it is, instead, a congregational church. *Doe, supra.* In reaching this decision, I join numerous other jurisdictions that have concluded that TEC is a hierarchical church. *See, e.g., Dixon v. Edwards,* 290 F.3d 699 (4th Cir. 2002); *In re Episcopal Church Cases,* 45 Cal.4th 467, 87 Cal.Rptr.3d 275, 198 P.3d 66 (2009); *Parish of the Advent v. Protestant Episcopal Diocese of Massachusetts,* 426 Mass. 268, 688 N.E.2d 923 (1997); *Masterson v. Diocese of Northwest Texas,* 422 S.W.3d 594 (TX 2014); *Falls Church v. Protestant Episcopal Church in the United States,* 285 Va. 651, 740 S.E.2d 530 (2013). I turn next to a discussion of *All Saints.*

## II. *All Saints*

As noted above, the trial judge's conduct of the trial and her rulings were governed, in large part, by her understanding of

---

**3.** Although a diocese (s)elects its own bishop, the bishop is not the ecclesiastical authority for the diocese until, *inter alia,* a majority of the standing committees for the remaining dioceses confirm his (s)election.

*All Saints.* As explained below, I would now overrule *All Saints* to the extent it holds that TEC's Dennis Canon and the Lower Diocese's own version of that Canon were ineffective in creating a trust over the property at issue here, and to the extent the opinion distorts the correct understanding of the neutral principles of law approach to resolving issues arising from a church schism. In so doing, I focus especially on the effects of corporate actions taken by ecclesiastical institutions.

In *All Saints*, the dispute was between the Lower Diocese and a congregation which sought to disaffiliate from the Diocese. The legal questions were which faction of the splintered Episcopal congregation owned the parish property, and which faction controlled the parish's vestry. *All Saints* decided the property issue by holding that TEC's 1979 "Dennis Canon" was ineffective in creating a trust over real and personal property titled in the name of the All Saints Parish. Further, in deciding the "legitimate vestry" issue, the Court indicated that the "neutral principles of law" approach required that in order for a civil court to determine whether a church-related dispute could be adjudicated in that forum, the court must look **only** at state corporate and property law, ignoring the ecclesiastical context entirely. If the civil court could determine the dispute applying state law, then the case could be resolved by it. Thus, *All Saints* undertook to analyze the disagreement in that case by treating the "All Saints Corporation" as independent of the "All Saints Parish." I find this analysis to be a distortion of the neutral principles approach. *See Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

In *All Saints*, the Court correctly explained "neutral principles of law" this way:

A clear recitation of the neutral principles of law approach as adopted by this Court was enunciated in *Pearson v. Church of God.* In *Pearson*, we articulated the rule that South Carolina civil courts must follow when adjudicating church dispute cases. We reaffirm and more fully explain this rule here. The *Pearson* rule provides:

(1) Courts may not engage in resolving disputes as to religious law, principle, doctrine, discipline, custom, or administration; (2) courts cannot avoid adjudicating rights

growing out of civil law; (3) in resolving such civil law disputes, courts must accept as final and binding the decision of the highest religious judicatories as to religious law, principle, doctrine, discipline, custom, and administration.

325 S.C. at 52-53, 478 S.E.2d at 853.

The *Pearson* rule establishes that where a civil court can completely resolve a church dispute on neutral principles of law, the First Amendment commands it to do so. Nonetheless, where a civil court is presented an issue which is a question of religious law or doctrine masquerading as a dispute over church property or corporate control, it must defer to the decisions of the proper church judicatories in so far as it concerns religious or doctrinal issues. *See Serbian Eastern Orthodox Diocese*, 426 U.S. at 709, 96 S.Ct. 2372 (finding that the controversy before the Court "essentially involve[d] not a church property dispute, but a religious dispute the resolution of which . . . is for ecclesiastical and not civil tribunals.").

*All Saints*, at 444-45, 685 S.E.2d at 172.

Properly applied, the "neutral principles" approach requires that the civil court's initial inquiry be a "holistic" one. The court must first determine whether the property/corporate dispute will require the court to decide issues of religious law, principle, doctrine, discipline, custom, or administration—in other words, is the property/corporate dispute actually ecclesiastical in nature. If the dispute is "a question of religious law or doctrine masquerading as a dispute over church property or corporate control," then the Constitution of the United States requires the civil court defer to the decision of the appropriate ecclesiastical authority. *All Saints, supra*. As explained below, this is the approach I expressly adopt and apply to decide the merits of the present dispute in § III, *infra*.[4] Before proceeding to that analysis, however, I reexamine the legal analysis applied in *All Saints* and the conclusions drawn there.

---

4. Acting Justice Toal contends I 'skip' this step entirely: I respectfully refer the reader to the penultimate sentence in the first paragraph under this section.

In 1979, the Supreme Court decided *Jones v. Wolf, supra.* Like the present case, *Jones* was a property dispute arising from a schism in a hierarchical church. The *Jones* Court acknowledged the ability of civil courts to resolve most church-based property disputes using deeds, state statutes, the local church charters, and the national church's constitution. The Court explicitly stated, however, that:

> Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.
>
> . . .
>
> The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Jones* at 603-4, 606, 99 S.Ct. 3020.

In 1979, TEC, acting through the General Convention, responded to *Jones* by enacting the so-called Dennis Canon. This Canon provides:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish,

Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains part of, and subject to this Church and its Constitution and Canons.

The Dennis Canon (Canon 1.7.4) is followed by Canon 1.7.5, which provides:

The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no such action shall be necessary for the existence and validity of the trust.

In 1987, the Lower Diocese of South Carolina adopted a version of the Dennis Canon as part of its own constitution, as did many of the Parishes.[5] Recall that accession to TEC's Canons, which included the Dennis Canon, and to the Lower Diocese's Constitution, which from 1987 forward included a diocesan version, were conditions of a parish or mission's membership in the Lower Diocese. Recall also that until the 2010 Diocesan Convention, Article 1 of the Diocesan Constitution provided: "The Church in the Diocese of South Carolina accedes to and adopts the Constitution and Canons of [TEC] and acknowledges this authority accordingly."

In *All Saints*, this Court first addressed the validity of the Trusts created by the Dennis Canon and Diocesan Constitution as applied to property belonging to the All Saints Parish at the time the Parish sought to disaffiliate from the Episcopal Church. In resolving the issue of the effect of TEC's adoption of the Dennis Canon in 1979, and the Lower Diocese's incorporation of the Canon into its own constitution in 1987, the Court reviewed the history of the All Saints Parish, extensively reporting and resolving title issues from 1745 until 1903. On the merits, the *All Saints* opinion simply holds:

---

5. The diocesan version of the Dennis Canon states: "All real and personal property held by or for the benefit of any Parish, Mission, or Congregation is held in trust for [TEC] and the [Lower Diocese]. The existence of this trust, however, shall in no way limit the power and Authority of the Parish, Mission, or Congregation existing over such property so long as the particular Parish, Mission, or Congregation remains a part of, and subject to, [TEC] and the [Lower Diocese]."

Furthermore, we hold that neither the 2000 Notice [recorded by the Diocese in the county courthouse reflecting the trust created by the Diocese and that created by the Dennis Canon] nor the Dennis Canon has any legal effect on title to the All Saints congregation's property. A trust "may be created by either declaration of trust or by transfer of property...." *Dreher v. Dreher*, 370 S.C. 75, 80, 634 S.E.2d 646, 648 (2006). It is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another. The Diocese did not, at the time it recorded the 2000 Notice, have any interest in the congregation's property. Therefore, the recordation of the 2000 Notice could not have created a trust over the property.

For the aforementioned reasons, we hold that title to the property at issue is held by All Saints Parish, Waccamaw, Inc., the Dennis Canons [sic] had no legal effect on the title to the congregation's property, and the 2000 Notice should be removed from the Georgetown County records.

*All Saints* at 449, 685 S.E.2d at 174.

I would now overrule *All Saints* to the extent it held the Dennis Canon and the 1987 amendment to the Lower Diocese's Constitution were ineffective in creating trusts over property held by or for the benefit of any parish, mission, or congregation in the Lower Diocese. The result in *All Saints* was obtained without considering the religious documents and texts, including the Diocesan Constitution, which formed the foundation of the relationships between All Saints Parish, the Lower Diocese, and TEC, and by ignoring the premise of *Jones* that a hierarchical church could direct the disposition of property in case of a schism with a minimal burden. Specifically, *All Saints* failed to acknowledge that, as a matter of church governance and administration, All Saints Parish had agreed to be bound by the "trust terms" found in the Dennis Canon and the Diocesan Constitution through its voluntary promises of allegiance, upon which the hierarchical church is founded, and by its conduct in remaining affiliated with TEC after 1979, and with the Lower Diocese after 1987. *All Saints'* failure to consider the entirety of these ecclesiastical relationships, the governing documents, and the parties' conduct, as well as the

assurances given by the *Jones'* majority that a hierarchical church could direct the ownership of property in the case of a schism, led to a violation of the command of *Pearson* that a court look at the entirety of the dispute, including the hierarchal church's constitution, canons, and rules, before determining whether the dispute can be resolved purely by the application of state law.

Further, I find that *All Saints* fell into error when it created an artificial division between All Saints' authority as a parish to withdraw from TEC and the Lower Diocese, and All Saints parish's corporate authority to withdraw by amending its bylaws and articles of incorporation in compliance with South Carolina law. The *All Saints* decision focused only on the parish corporation's compliance with the provisions of the South Carolina Non-Profit Act, S.C. Code Ann. §§ 33-31-100, *et seq.* (2006 and Supp. 2016). The opinion concluded that the corporate formalities had been properly executed and thus the parish had effectively withdrawn from TEC. The flaw in this section of the *All Saints* decision is that it relies on a false dichotomy between parish as ecclesiastical unit and parish as a corporate entity,[6] and fails to acknowledge the dispositive statute in the Non-Profit Act.

---

**6.** I find persuasive this passage from Justice Lehrmann's dissent in *Masterson v. Diocese of Northwest Texas*, 422 S.W.3d 594, 617-18 (TX 2014):

When deciding whether a matter invokes constitutional protection, I believe that we should err on the side of caution, upholding constitutional mandates when in doubt.
The Court divides the questions of Good Shepherd *parish's* authority to withdraw from TEC and Good Shepherd *corporation's* authority to withdraw by amending its bylaws and articles of incorporation. . . . In my view, however, the two inquiries are inextricably linked. The Court goes on to conclude that, because the parish at issue was incorporated and because there was no specific TEC or diocesan restriction on the corporation's authority to amend its bylaws and articles of incorporation, the validity of Good Shepherd's withdrawal by amendment of those documents was *not* an ecclesiastical question. . . . I am unconvinced that the incorporated status of the parish removes the issue from the realm of church polity. If [the Bishop's] determination that the parish could not withdraw from TEC is a binding ecclesiastical decision, it does not cease to be so because of the corporate form taken by the parish. Such a determination permits civil courts to conduct an end-run around the First Amendment's prohibition against inquiry into and resolution of religious issues by

The omitted statute, § 33-31-180 (2006) [7] provides:

§ 33-31-180. Religious corporations; Constitutional protections.

If religious doctrine governing the affairs of a religious corporation is inconsistent with the provisions of this chapter on the same subject, the religious doctrine controls to the extent required by the Constitution of the United States or the Constitution of South Carolina, or both.

Once effect is given to § 33-31-180, and the disaffiliated parish's actions in *All Saints* are viewed through the proper constitutional lens, it is patent that the civil courts of South Carolina were obligated to accept the ecclesiastical decision

---

effectively allowing the lower church entity's unilateral decision to trump the higher entity's authority over matters of church polity. Notably, the Court recognizes that "what happens to the relationship between a local congregation that is part of a hierarchical religious organization and the higher organization when members of the local congregation vote to disassociate is an ecclesiastical matter over which civil courts generally do not have a jurisdiction." *Id.* at 607 (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976)). "But what happens to the property is not," the Court continues, "unless the congregation's affairs have been ordered so that ecclesiastical decisions effectively determine the property issue." *Id.* It follows that [the Bishop's] determination regarding the parish's authority (or, more accurately, lack of authority) to withdraw from TEC is a binding ecclesiastical decision, irrespective of the corporate form taken by the parish. In turn, since Good Shepherd did not validly withdraw from TEC, Good Shepherd remained a constituent thereof and consequently remained subject to TEC's and the Diocese's Constitutions and Canons.

There appears to be no dispute that, as a TEC parish, Good Shepherd could not pick and choose those portions of the governing documents by which it wished to be bound. And the Dennis Cannon [sic] and its diocesan counterpart expressly state that the church property is held in trust for TEC and the Diocese. Thus, if Good Shepherd had no authority to withdraw, it had no authority to revoke its adherence to the Canons or to revoke the trust placed on the property by virtue thereof. Moreover, the Canons condition Good Shepherd's authority over the church property on its "remain[ing] a part of, and subject to, this Church and its Constitutions and Canons." By purporting to withdraw from TEC, then, Good Shepherd took the very action that would strip it of its rights in the property. Good Shepherd may not avoid the consequences of its actions—consequences to which it had freely agreed—simply by voting to no longer be subject to those consequences.

7. This statute was the foundation of the trial court's order in *All Saints*.

that the so-called "minority vestry" were the *All Saints* parish's true officers. Had the *All Saints* Court analyzed the issue under all the relevant authorities, it would have been clear that the Court could not adjudicate the corporate legitimacy claim, as the question which group was the "true vestry" was a matter of religious law and doctrine, and both the Constitution and § 33-31-180 required that the Court accede to TEC's and the Lower Diocese's determination of the "true vestry." *See Pearson, supra.*

Here, the trial court sought to faithfully apply the flawed analytical framework created by *All Saints*. In so doing, she unwittingly violated the constitutional precepts that underlie the "neutral principles of law" approach to the resolution of church disputes.

I now turn to the facts of this case in order to determine whether the trial court properly determined that the present property/corporate dispute was cognizable in the civil court.

## III. Application

While *All Saints* deemed the reason(s) for the disaffiliated parish's corporate actions irrelevant to the dispute, I find that the underlying reasons for the schism here are relevant to the determination whether this dispute is, at its core, one grounded in "religious law, principle, doctrine, discipline, custom, or administration" and thus not cognizable in civil court. *See Pearson*, 325 S.C. at 53, 478 S.E.2d at 851-2. Although the trial judge understandably sustained respondents' objections to much of the evidence offered to explain the Disassociated Diocese's decision to leave TEC in light of *All Saints*, I find there is sufficient evidence in the record to support my finding that doctrinal issues were the trigger. *Doe, supra.* A brief overview of that evidence follows.

In 2006, the Lower Diocese of South Carolina convened to select a new bishop and the Diocesan Convention elected Mark Lawrence. There was evidence that Bishop Lawrence was understood to be disenchanted with TEC's direction.[8] His

---

8. Prior to 2006, TEC's General Convention confirmed the selection of the first openly homosexual bishop in TEC. Bishop Lawrence testified the Disaffiliated Diocese had become "uncomfortable with the trajectory of the general convention of the Episcopal Church." In referring to

2006 election did not garner the support of a majority of TEC's other dioceses, however, a requirement for a bishop's election to be valid. In 2009, Bishop Lawrence was ordained as Bishop of the Lower Diocese following his reassurances to the other dioceses he would make the requisite vows of conformity to TEC's Canons and Constitution. The record reflects that Bishop Lawrence did make these vows.

The record demonstrates that Bishop Lawrence and others in the Lower Diocese determined to leave TEC and to take with them the property of those parishes in the Lower Diocese that were intending to disaffiliate. For example, a former president of the Lower Diocese's Standing Committee testified that the Diocese's bank accounts were moved to "friendly bankers" out of fear that the accounts might be frozen if Bishop Lawrence were to be disciplined by TEC. This witness testified he received a call in 2009 from another priest in the Lower Diocese who expressed concern that Bishop Lawrence was "not moving quickly enough to take the [Lower Diocese] out of [TEC]," and reminded the witness that they had elected Lawrence "to take us out of [TEC]."

Following this Court's opinion in *All Saints*, which held that the All Saints Parish was not bound by TEC's Dennis Canon or by the Diocesan Constitution's version of the Canon, and that a parish could disaffiliate from the Diocese simply by amending its corporate documents, Bishop Lawrence and his supporters undertook certain actions.[9] Among other things,

---

the Presiding Bishop of TEC, Katharine Jefforts Schori, Bishop Lawrence testified she had gone "contrary to the historic teachings of the church and the Holy Scriptures" and admitted this involved "the sexuality issue."

9. Acting Justice Toal ignores the evidence in the record, and concludes that in creating and disseminating these deeds and in purporting to alter the Lower Diocese's governance documents, "Bishop Lawrence [was] clearly acting on the [TEC's] behalf...." This astounding conclusion is supported by the equally stunning assertion that "[TEC] was fully aware of what Bishop Lawrence's intentions were when he was made a bishop...." The evidence reflects, in fact, that TEC was (rightfully) concerned about the Bishop's intentions and that his 2006 election not receive the consent necessary from the diocesan standing committee for years, and then only after his written assurances (1) that he would make the requisite vows of conformity to TEC's Canons and

the Diocesan Convention began the process of amending the Lower Diocese's governing documents, and began providing Parishes with quitclaim deeds purporting to disclaim any interest of the Diocese in each Parish's property. Parishes, however, were asked to delay recording these deeds until 2011 because, as a witness for respondents testified, there was fear TEC would discipline Bishop Lawrence if the quitclaim deeds were recorded and his actions became public.

Following the *All Saints* decision, certain leaders in the Lower Diocese, among the Trustees, and within the leadership of various parishes in the Diocese undertook to sever the relationship between themselves and TEC through corporate amendments. On October 19, 2010, Bishop Lawrence executed Nonprofit Corporation Articles of Amendment which purported to amend the language concerning the purpose of the Lower Diocese set forth in its 1973 incorporation. The amendment purportedly altered the purpose from "to continue the operation of an Episcopal Diocese under the constitutions and canons of the Protestant Episcopal Church in the United States of America" to "to continue operation under the Constitution and Canons of The Protestant Episcopal Church in the Diocese of South Carolina." Other corporate actions were taken during this period which purported to alter the governance structure of the Diocese, and many of the Parishes undertook similar corporate alterations. During 2010, the Trustees met to amend their corporate bylaws, which stated the corporation would carry out its duties under the authority of TEC's Constitution and Canons, to remove these references.

On December 5, 2012, Bishop Lawrence was informed that TEC's Presiding Bishop accepted his renunciation of orders, and shortly thereafter, a letter confirmed the action.[10] On

---

Constitution and (2) that "[his] intention is to remain in the Episcopal Church, period."

**10.** The letter stated in pertinent part: "In accordance with Title III, Canon 12, Section 7 of the Constitution and Canons of [TEC] and with the advice and consent of the Advisory Committee to the Presiding Bishops, I have accepted the renunciation of ordained ministry of this church made in writing on November 17th, 2012, by the Right Reverend Mark Joseph Lawrence, Bishop of South Carolina." Bishop Lawrence contends he never made such a renunciation. November 17,

January 4, 2013, the Respondents filed this suit for a declaratory judgment seeking a declaration that respondent Disassociated Diocese was the true Diocese in the lower part of South Carolina, that all property at issue belonged to that faction, and for injunctive relief against the Appellants. On January 26, 2013, Charles vonRosenberg was elected and ordained as the Bishop of appellant Associated Diocese.

The finding that TEC is hierarchal requires that I defer to its highest ecclesiastical body. *Pearson, supra.* TEC's acceptance of Bishop Lawrence's renunciation of orders and the subsequent ordination of Bishop vonRosenberg are decisions that the civil court "must accept as final and binding...." *Pearson,* 325 S.C. at 52-53, 478 S.E.2d at 853. Because TEC has recognized the Associated Diocese to be the true Lower Diocese of South Carolina with Bishop vonRosenburg as its head, a civil court cannot inject itself into this church governance dispute and reevaluate that decision applying state law principles because this is a question of church polity, administration, and governance, matters into which civil courts may not intrude. The circuit court erred in allowing itself to become entangled in the questions of which competing claimant was the true successor of the Lower Diocese.

 Further, the civil courts in South Carolina cannot decide disputes which are governed by church polity and governance concerning property ownership. For the reasons given above, I have determined that the real and personal property disputes sought to be adjudicated in this civil lawsuit are "question[s] of religious law or doctrine masquerading as a dispute over church property [and] corporate control...." *See All Saints* at 445, 685 S.E.2d at 172. I find, therefore, the Court "must defer to the decision of the proper church judicatories...." *Id.* "What happens to the relationship between a local congregation that is part of a hierarchical religious organization when members of the local congregation vote to disassociate is an ecclesiastical matter over which civil courts generally do not have a jurisdiction." *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). Here, the church governing documents

---

2012, is the date the Disassociated Diocese held a Special Convention affirming the Diocese's disaffiliation from TEC.

establish that as of 2010, the Lower Diocese had agreed since at least 1822 to be part of TEC and to be bound by its Constitution and Canons. These documents make clear that since at least 1979, and explicitly since 1987, the Lower Diocese, the Trustees, and the Parishes accepted that the property in dispute in this case was held in trust for TEC, and was controlled by the Diocese, the Trustees, and the Parishes only so long as they remained part of TEC. Here, both TEC and Lower Diocese had in place provisions governing the disposition of property in the event of a disaffiliation as contemplated by *Jones*. I believe the Court is "[constitutionally] bound to give effect to the result indicated" by TEC and the Lower Diocese, especially since both entities enacted these provisions "before the dispute erupt[ed]." *Jones, supra* at 606, 99 S.Ct. 3020. I would therefore reverse the circuit court's decision to the extent it declined to give effect to the Dennis Canon and its diocesan counterpart, and to the extent it held that the Disassociated Diocese, the Trustees, and parishes controlled or owned the disputed real and personal property.[11]

## IV. Service Marks

■ The trial court upheld the Respondents' claim that state trademarks it began filing in 2010 were being infringed upon by the Appellants in violation of S.C. Code Ann. § 39-15-1160 (Supp. 2016) and §§ 16-17-310 and 320 (2016), leading to confusion. It therefore enjoined the Appellants from "using,

11. As Acting Justice Toal acknowledges, the determination that this dispute is ecclesiastical is tantamount to recognizing the validity of the trusts. By denying the ecclesiastical nature of this dispute, Chief Justice Beatty, Justice Kittredge, and Acting Justice Toal free themselves from First Amendment constraints and, among other things, impose a requirement that each local church must specifically accede to the Dennis Canon before it can be bound. Such a requirement entangles the civil court in church matters, for TEC's Canons specifically provide that "no such action shall be necessary for the existence and validity of the trust." Canon 1.7.5, and the Diocesan Constitution expressly provided for accession to, adoption of, and acknowledgment of the authority of TEC's Constitution and Canons. *Jones* requires only that "a religious organization ... ensur[ing] that a [church property] dispute ... will be resolved in accord with the desires of the members...." indicate those desires in "some legally cognizable form...." *Jones* does not require that these "cognizable forms" be created in a way that satisfies the specific legal requirements in each jurisdiction where the church property is located.

assuming, or adopting" certain "names, styles, emblems, or marks" claimed by the Respondents. I agree with the Appellants that in light of the evidence of the confusion created by the Respondents' use of the term 'episcopal,' with TEC's federally-registered trademarks, which include "The Episcopal Church" and "The Protestant Episcopal Church in the United States of America," state law dictates that the Appellants right to these marks is superior, and that therefore the Respondents' state marks must be cancelled. *See* S.C. Code Ann. § 39-15-1145(3)(f) (Supp. 2016). I would therefore reverse the injunctive relief granted by trial court.

## CONCLUSION

I would overrule *All Saints* to the extent it held the Dennis Canon and the diocesan equivalent did not create effective trusts in South Carolina, and to the extent that it holds that corporate actions taken by Episcopal dioceses, parishes, missions, and related corporations can be reviewed without reference to TEC's Constitution, Canons, and other authorities, and without reference to § 33-31-180. Further, the question of which diocese is "legitimate" is a question of church governance and not a matter to be resolved in the civil courts of South Carolina. I would therefore reverse the circuit court's order to the extent it rejected the efficacy of the Dennis Canon and the Diocesan Constitution, and to the extent it declined to accept TEC's recognition of the Associated Diocese as the true Lower Diocese of South Carolina. In addition, I would reverse the injunction granted to respondents on their service mark claim.

Finally, while all **individuals** are guaranteed the freedom to disassociate from a religious body, here the question of the disposition of ecclesiastical property following the disaffiliation from the TEC by the Disassociated Diocese, the Trustees, and the Parishes, is a question of church governance, which is protected from civil court interference by the First Amendment.

For the reasons given above, I would reverse the circuit court's order and also join Justice Hearn's opinion.

HEARN, J., concurring in a separate opinion. BEATTY, C.J., concurring in part and dissenting in part in a separate opinion. KITTREDGE, J., concurring in part and dissenting in part in a separate opinion. Acting Justice Jean H. Toal dissenting in a separate opinion.

JUSTICE HEARN:

I concur fully with Acting Justice Pleicones's thorough and well-reasoned lead opinion, but write separately because of the magnitude of this case and its far-reaching effects not only on the Episcopal Church ("the National Church") but also all other hierarchical religious organizations.[12]

The primary issue before the Court is which of two competing dioceses is the true Episcopal diocese in the lower half of South Carolina and thus has the right to control the property at issue which consists of thirty-six parish churches and Camp Saint Christopher on Seabrook Island. Because the National Church has ordained Charles vonRosenberg and recognizes him as the Bishop in the Lower Diocese, this Court, under long-settled principles, must defer to that decision. Consequently, I would find the actions of the breakaway bishop, Mark Lawrence, and his followers in leaving the National Church and attempting to take its property with them, are ineffective. Additionally, consistent with the majority of state court decisions which have considered this issue, under neutral principles of law, the Dennis Canon [13] controls and imposes an express trust on the property in favor of the National Church. Therefore, I concur with the lead opinion and would confirm title to the property at issue in the National Church and reverse.[14]

---

12. I emphasize that our holding does not, as the dissent claims, affect *all* trusts in South Carolina; rather, our holding is limited to ecclesiastical decisions protected by the First Amendment, as will be explained herein.

13. A canon is "[a] law, rule, or ordinance in general, and of the church in particular. An ecclesiastical law or statute." *Black's Law Dictionary* 206 (6th ed. 1990).

14. At the outset, I find the trial was permeated by errors which necessarily dictated the outcome. The threshold issue in resolving this dispute was an analysis of the structure of the National Church—

As the lead opinion thoroughly explains, there can be but one conclusion based on the record before us and the overwhelming consensus of our sister jurisdictions, and that is the National Church is hierarchical in nature.[15] With that in mind, I turn to the claims raised by the respective parties.

## ANALYSIS

### I. ECCLESIASTICAL DEFERENCE

I believe it is clear this dispute arises out of doctrinal differences between the National Church and the Breakaway Diocese. I therefore find that we are required in this instance to exercise restraint and defer to the highest ecclesiastical body of this hierarchical church. Though the Breakaway Diocese has attempted to frame this as a matter of simple corporate law fit for resolution in civil court, we are bound by

whether it is hierarchical or congregational—and the nature of the relationship between the thirty-six parishes and the National Church. After repeatedly stating on the record that the church's structure was "irrelevant," and refusing to admit evidence on this issue, insisting that South Carolina was not a "hierarchical state," the trial court found in its order that the National Church "is not organized in a fashion that its governance controls the Dioceses or the parish churches. Authority flows from the bottom, the parish churches, up." Additionally, although there can be no question that the individual parishes have been affiliated with the National Church for decades, the trial court found in its order that "[n]one of the Plaintiff parish churches have ever been members of [the National Church]."

The significance of this error in refusing to recognize the National Church's hierarchical design and the historical relationship of the individual parishes to the National Church cannot be overstated. By mischaracterizing the structure of the National Church and the nature of the relationship between it and the individual parishes, the trial court employed an erroneous framework in resolving this dispute.

**15.** *See, e.g., Dixon v. Edwards*, 290 F.3d 699, 716 (4th Cir. 2002) ("Our examination of this record, and our study of the organization and operation of the Episcopal Church, compels the determination that the court was correct in both its analysis and in its conclusion: The Episcopal Church is hierarchical."); *Episcopal Diocese of Massachusetts v. Devine*, 59 Mass.App.Ct. 722, 797 N.E.2d 916, 921 (2003) ("Based on our review of the record we conclude ... that the Episcopal Church is hierarchical."); *Episcopal Diocese of Rochester v. Harnish*, 11 N.Y.3d 340, 870 N.Y.S.2d 814, 899 N.E.2d 920, 921 (2008) ("The National Church has a hierarchical form of governance. Its governing body, the General Convention, adopted—and periodically amends—a constitution and canons that manifest its doctrinal law.").

the Constitution and our own precedent from interjecting ourselves into religious matters masquerading as disputes over property or corporate control. *See Serbian E. Orthodox Diocese for U.S. and Canada v. Milivojevich*, 426 U.S. 696, 709–10, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of South Carolina*, 385 S.C. 428, 445, 685 S.E.2d 163, 172 (2009).

The use of the word "masquerade" by the United States Supreme Court in *Milivojevich* is particularly germane here. Whether used as a noun ("a disguise or false outward show") [16] or as a verb (to "have or put on a deceptive appearance"),[17] the word aptly describes the actions of Bishop Lawrence and the Breakaway Diocese. Despite the vows and written assurances made by Bishop Lawrence concerning his loyalty to the National Church, within a few short years of his ordination, the masquerade began.[18] Bishop Lawrence and his followers provided parishes with quitclaim deeds designed to disclaim any interest of the Diocese in each parish's property. In furtherance of a pretense of loyalty, these quitclaim deeds were not made public; rather, parishes were asked to delay their recording. Bishop Lawrence's group also quietly changed the Diocese's bank accounts, seeking out "friendly bankers" who would provide assurances that the accounts would not be frozen when litigation commenced. Importantly, the fuse which ignited this powder keg was without question the divergent views on the doctrines and teachings of the National Church.

Although the trial court barred the National Church from introducing evidence as to the reason for the Breakaway Diocese's actions, it is clear from the record that doctrinal issues concerning marriage and the role of women were the

---

**16.** THE AMERICAN HERITAGE DICTIONARY 770 (2d College ed. 1982).

**17.** *Id.*

**18.** Although the dissent takes issue with my recitation of Bishop Lawrence's role in this rift, the facts contained herein are undisputed in the record and many are based upon direct admissions from Lawrence himself. Moreover, I find these facts highly relevant—if not essential—in addressing Bishop Lawrence's alleged breach of fiduciary duties owed to the National Church, as discussed *infra*.

trigger. A witness for the dissociated parishes testified that it was "a doctrinal issue" which prompted St. Andrew's in Mt. Pleasant to leave the National Church. Another parish witness stated that the National Church "seemed to be moving away from the Christ teaching [sic] that marriage is between a man and a woman." Other parish witnesses testified they were leaving the National Church because of the way it was treating Bishop Lawrence, obviously referring to the National Church's discipline of Bishop Lawrence as a result of his actions in leading the Breakaway Diocese out of the National Church. Bishop Lawrence testified the Breakaway Diocese had become "uncomfortable with the trajectory of the general convention of the Episcopal Church." In referring to the then-Presiding Bishop of the National Church, Katharine Jefforts Schori, Bishop Lawrence testified she had gone "contrary to the historic teachings of the church and the Holy Scriptures" and admitted this involved "the sexuality issue."

Given this background, I find this case is factually distinguishable from our holding in *All Saints* and more analogous to the dispute in *Milivojevich* where the Supreme Court found the issues were inextricably tied to "a matter of internal church government, an issue at the core of ecclesiastical affairs." 426 U.S. at 721, 96 S.Ct. 2372. Furthermore, our holding is not wholly contradictory to *All Saints*; rather it is grounded in one of the very principles that case reaffirmed. 385 S.C. at 445, 685 S.E.2d at 172 (finding that if a question of religious law or doctrine is masquerading as a dispute over property or corporate control, the court must defer to the ecclesiastical body).

In essence, resolving this dispute would require us to decide which faction is the "true" Episcopal Church. Because the National Church has recognized the remaining diocese to be the true Lower Diocese of South Carolina with Bishop vonRosenburg at its head, we cannot inject ourselves into this dispute in such a manner as to overrule that determination. *See Milivojevich*, 426 U.S. at 721, 96 S.Ct. 2372. This Court has repeatedly acknowledged its constitutional mandate to refrain from wading into matters of internal organization, or ecclesiastical rule, custom or law. *All Saints*, 385 S.C. at 445, 685 S.E.2d at 172; *Pearson v. Church of God*, 325 S.C. 45, 49–50, 478 S.E.2d 849, 851–52 (1996). This decision is unquestion-

ably a matter of church polity and governance, matters into which civil courts should not intrude. On this basis alone, I would reverse the decision of the trial court.

With the guarantees of the First Amendment in mind, the National Church purposely and consciously decided to structure its organization in the manner espoused in its constitution and canons. Dating back to the early 19th century, churches were built, congregations grew, and members attended services, all with voluntary acceptance of the National Church's governing framework. In fact, Title II, Canon 6.1 of the National Church's constitution and canons states, "No Church or Chapel shall be consecrated until the Bishop shall have been sufficiently satisfied that the building and the ground on which it is erected are secured for ownership and use by a Parish, Mission, Congregation, or Institution **affiliated with this Church and subject to its Constitution and Canons.**" (Emphasis added.) Thus, by these very terms, houses of worship cannot be members of the "Episcopal Church" unless they are subject to the National Church's governing authority.

The National Church's constitution and canons are as much a part of its identity as a religious organization as the scriptures themselves. As a Court, we can no more decide what it means to be part of the "Episcopal Church" than we can dictate how the National Church chooses to worship. The inextricable link between the National Church's religious structure and the dispute before the Court is supported by abundant evidence. Accordingly, I find the current litigation before the Court is, at its heart, controlled by matters of religious doctrine, and therefore I would defer resolution to the ecclesiastical authorities of the National Church.

Nevertheless, in light of the Breakaway Diocese's insistence that the case is ripe for resolution in this Court, I continue to address equally compelling grounds to support the lead opinion's holding.

## II. NEUTRAL PRINCIPLES

Even were we to wade into this dispute and resolve it solely on neutral principles as the dissent insists, I would still find the trial court erred in holding the Dennis Canon ineffective and in giving effect to Bishop Lawrence's attempts to change

the corporate charter and form. More importantly, I believe the writings, conduct, and relationship between the parties all evince the necessary intent to create a legally cognizable express trust, enforceable in favor of the National Church.

In considering the application of neutral principles, I turn to *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), and the response of the National Church and the Lower Diocese to its holding. In *Jones*, the four dissenting Justices would have gone even further than the majority to hold that a rule of compulsory deference was necessary in order to protect the free exercise rights of those who had formed a religious association. The majority's response to that criticism resulted in this passage which is critical to our resolution today:

> At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. **Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound** to give effect to the result indicated by the parties, provided it is in some legally cognizable form.

*Id.* at 606, 99 S.Ct. 3020 (emphasis added).

Two months after the decision in *Jones*, and in obvious response to the invitation contained therein, the National Church adopted the Dennis Canon, which recites an express trust in favor of the denominational church. That same year, the National Church also adopted a companion canon which stated, "The several Dioceses may, at their election, **further confirm** the trust declared under the [Dennis Canon] by appropriate action **but no such action shall be necessary for the existence and validity of the trust.**" (Emphasis added.) Significantly, in 1987 the Lower Diocese did exactly that— confirming its acknowledgement of the trust by adopting its own mirror image of the Dennis Canon.[19] The dissent fails to

---

19. That canon stated, "All real and personal property held by or for the benefit of any Parish, Mission, or Congregation is held in trust for the

mention the Diocesan canon or analyze its importance in its opinion, perhaps for the same reason it does not discuss the hierarchical nature of the National Church and why that is critical to the resolution of the case before us.

There is no question that South Carolina adheres to neutral principles in resolving church property disputes. *See Pearson, supra; All Saints, supra.* However, that does not mean we are "not a hierarchical state," as the trial court repeatedly stated. Adherence to neutral principles does not require us to ignore the clear language of the United States Supreme Court in *Jones* as to how hierarchical churches like the National Church may protect their property, nor the actions of the Plaintiffs before us. In fact, the proper application of neutral principles entails a holistic analysis of deeds, corporate charters, and the constitution and governing documents of the general church. In 1841, the delegates to the Diocesan Convention of South Carolina voted unanimously to accede to the National Church's constitution and canons. When the Diocese of South Carolina wished to divide into two dioceses, permission was sought from the National Church to do so and was granted. When the Lower Diocese was incorporated in 1973, its stated corporate purpose was "to continue an Episcopal Diocese under the Constitution and Canons of the Protestant Episcopal Church in the United States of America." Representatives from the Diocese were present at the General Convention in 1979 when the Dennis Canon was adopted. In 1987, the Diocese adopted its own language reaffirming the trust imposed by the Dennis Canon. Accordingly, Respondents acted consistently both before and after the enactment of the Dennis Canon by the General Convention as though the National Church held a trust interest in the property at issue, going so far as to expressly acknowledge the existence of the trust in their own Diocesan canon.

---

Episcopal Church and the Protestant Episcopal Church in the Diocese of South Carolina. The existence of this trust, however, shall in no way limit the power and Authority of the Parish, Mission, or Congregation existing over such property **so long as the particular Parish, Mission, or Congregation remains a part of, and subject to, the Episcopal Church and the Protestant Episcopal Church in the Diocese of South Carolina.**" (Emphasis added.)

The highest courts in many other jurisdictions have concluded that the Dennis Canon applies to defeat claims of ownership and control over church property by disassociated parishes, "even in cases in which record title to the property has been held in the name of the parish since before enactment of the provision." *Episcopal Church in the Diocese of Connecticut v. Gauss*, 302 Conn. 408, 28 A.3d 302, 321 (2011); *In re Episcopal Church Cases*, 45 Cal.4th 467, 87 Cal.Rptr.3d 275, 198 P.3d 66, 84 (2009); *Bishop & Diocese of Colorado v. Mote*, 716 P.2d 85, 108–09 (Colo. 1986); *Rector, Wardens, Vestrymen of Christ Church in Savannah v. Bishop of Episcopal Diocese of Georgia, Inc.*, 290 Ga. 95, 718 S.E.2d 237, 254 (2011); *Daniel v. Wray*, 158 N.C.App. 161, 580 S.E.2d 711, 719 (2003); *Episcopal Diocese of Rochester v. Harnish*, 11 N.Y.3d 340, 870 N.Y.S.2d 814, 899 N.E.2d 920, 925 (2008) ("We conclude that the Dennis Canons clearly establish an express trust in favor of the Rochester Diocese and the National Church."); *In re Church of St. James the Less*, 585 Pa. 428, 888 A.2d 795, 810 (2005); *Falls Church v. Protestant Episcopal Church in U.S.*, 285 Va. 651, 740 S.E.2d 530, 540 (2013) ("In the present case, we need look no further than the Dennis Canon to find sufficient evidence of the necessary fiduciary relationship. As a number of courts in other states have noted, the Dennis Canon 'merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses since the founding of [the National Church] in 1789.' "). Unlike the dissent, none of these jurisdictions based the validity of the Dennis Canon on the formal execution of trust documents following its enactment.

In my view, the language in *Jones* that "[a]t any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property" by reciting an express trust in favor of the denominational faction has clearly been met here. As noted by the Connecticut Supreme Court in *Episcopal Church in the Diocese of Connecticut, Jones v. Wolf* "not only gave general churches explicit permission to create an express trust in favor of the local church but stated that civil courts would be *bound* by such a provision." 28 A.3d at 325 (emphasis in original). The dissent ignores the United States Supreme Court's admonition that the "burden" on national churches in

taking steps to impose an express trust over church property "**will be minimal.**" *Jones*, 443 U.S. at 606, 99 S.Ct. 3020 (emphasis added). There is no question but that the National Church more than met this minimal burden in enacting the Dennis Canon, and under *Jones*, this Court is bound to recognize the trust it created. The Dennis Canon, the Diocesan Canon, and the mandate found in the National Church's canons declaring that affiliated parishes are bound by its governing laws satisfy the legally cognizable form and the intent to create a trust which Acting Justice Toal claims are absent. *See Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.)*, 352 Or. 668, 291 P.3d 711, 720 (2012) (explaining "the neutral principles approach does not free the courts from examining and potentially giving legal effect to church documents").

To suggest that to comply with the blueprint laid out by the United States Supreme Court, the National Church would be required to obtain a separate trust instrument from each of the thirty-six parishes would impose a constitutionally impermissible burden on the National Church and violate the First Amendment. As it stands now, the trial court's order shows no regard for the self-governance of the National Church and instead attempts to wrongfully supplant enforceable religious canons. Thus, I join the lead opinion in departing from *All Saints* to the extent it held that the Dennis Canon and subsequent acquiescence by individual parishes were insufficient to establish a trust in favor of the National Church.[20]

---

**20.** I fear the approach urged by the dissent would ultimately lead to confusion, voluminous litigation, and uncertainty for religious organizations. Of what importance is it that a religious body be hierarchical in nature, if any individual church can choose to disassociate from the higher body and take all property with it? For decades, religious organizations have structured their affairs to comply with the roadmap drawn out in *Jones* where the Supreme Court expressly annunciated a minimal burden for them to ensure a continuing body. If we were to ignore this, it logically follows that any hierarchical church would struggle to maintain itself. At any doctrinal difference, an individual parish could decide it disagrees with the teachings of the national body, break away and proclaim itself the "true" church. In a hierarchical church, the individual parishes look to the head of the church to provide guidance and steer the course of worship, not the other way around. Were we to adopt the dissent's approach, the tail would be wagging the dog.

I agree with Justice Kittredge's dissent in recognizing the unique nature of trusts as applied to religious organizations, but I cannot embrace his conclusion that the trust imposed by the Dennis Canon is revocable at any time—a finding unsupported by any authority. To give credence to the terms of the Dennis Canon only to conclude that it is revocable at the whims of the parishes surely renders this a trust in name only. I find compelling the language used by the majority in *Jones v. Wolf* that "the parties can **ensure**, if they so desire, that the faction loyal to the hierarchical church will retain the church property." 443 U.S. at 606, 99 S.Ct. 3020 (emphasis added). If we conclude the trust is merely revocable, then certainly the parties cannot *ensure* the National Church retains the property, and *Jones v. Wolf's* clear effort to prevent property disputes in the wake of church schisms is rendered meaningless.

Justice Kittredge also posits that the provisions of the South Carolina trust code which unquestionably render the trust irrevocable are not enforceable here because, he argues, the National Church's entire case is based on the derogation of our trust code. At the outset, I find this to be a mischaracterization of the National Church's position because it did not contend strictly that the trust imposed by the Dennis Canon was wholly independent from South Carolina law; to the contrary, the National Church repeatedly argued for the existence of an express trust, created pursuant to our established trust law. Furthermore, I find this reasoning inconsistent with Justice Kittredge's subsequent claim that Respondents withdrew their accession to the Dennis Canon "in accordance with state law." What we cannot do is pick and choose which state laws to apply in order to justify a desired result. Thus, I would not be so selective in adhering to one law addressing the manner in which Respondents may revoke the trust, while at the same time disregarding the very statute that controls whether the trust, once created, is revocable.

Respectfully, I disagree with my colleague and would apply the appropriate statute which resolves the issue: South Carolina Code Section 62-7-602(a) (Supp. 2016) (common law default rule of irrevocability applies to trusts created before the effective date of the statute [January 1, 2006]). When faced with a similar schism in the Presbyterian Church, the

Supreme Court of Oregon—also applying the Uniform Trust
Code and adhering to neutral principles—found the express
trust in favor of the denominational church was irrevocable
because it was created before Oregon's adoption of the UTC.
*See Hope Presbyterian Church,* 291 P.3d at 726–27. I would
follow the approach taken by Oregon and look to our statutory
code, which provides this simple answer to any question of
revocability: the trust is irrevocable because it was created
prior to the implementation of the SCTC. S.C. Code Ann.
§ 62-7-602(a).

With regard to the dissent's proposition that eight [21] of the
dissociated parishes formerly affiliated with the National
Church were nevertheless free to ignore the provisions of the
Dennis Canon, I believe this issue is not properly before the
Court because, from my review of the record, the argument
was not raised by Respondents at the trial court level, nor was
it argued on appeal before this Court. To base its opinion on
such reasoning now signifies the dissent's departure from this
Court's longstanding adherence to issue preservation rules.
*See I'on, LLC v. Town of Mt. Pleasant,* 338 S.C. 406, 420, 526
S.E.2d 716, 723 (2000).

Justice Kittredge suggests that I am ignoring Rule 220(c)
by insisting that the Court should not reach this issue of the
seven or eight churches. I am aware of the language in
subsection (c) which provides that the "appellate court *may*
affirm any ruling, order, decision or judgment upon any
ground(s) appearing in the Record on Appeal." (Emphasis
added.) However, case law from this Court which interprets
the Rule provides guidance on when this provision should be
utilized. In *I'on* this Court streamlined the procedure for the
use of additional sustaining grounds, and held only that the
basis for a respondent's additional sustaining grounds "must
appear in the record on appeal." 338 S.C. at 420, 526 S.E.2d at
723. Here, Acting Justice Toal purports to satisfy that princi-
ple by plucking this argument concerning the seven or eight
churches, not from anything mentioned by Respondents in the
pleadings, the record, or the brief, but rather from the post-
trial motion filed by the National Church. In doing so, she

---

**21.** There is a discrepancy as to the precise number of parishes alleged
to fall within the scope of this argument.

ignores this language from *I'On* which I view as critical to an appellate court's decision as to whether or not to exercise the discretion afforded by the Rule to affirm on this basis: "Of course, a respondent may abandon an additional sustaining ground under the present rules—just as a respondent could under the former rules—by failing to raise it in the appellate brief." *Id.* This is precisely what I believe occurred here, and while I agree that this Court *may* affirm on any ground contained in the record on appeal, as provided by Rule 220(c), I believe this is surely one of those instances where it "would be unfair or unwise to resolve a case on a ground never mentioned by the respondent," given the dearth of evidence on this issue in this voluminous record. *See* Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 62 (2d ed. 2002). Quite simply, too many discrepancies exist to resolve the issue on this record, the most glaring being the actual number of entities to be affected—by the National Church's count the number is seven while Acting Justice Toal asserts it is eight. Accordingly, it is not the case, as Justice Kittredge posits, that I am ignoring the language in Rule 220(c), but rather that I would honor the language in *I'On* and elect not to reach this issue where it was never raised by Respondents and doing so injects an alarming degree of uncertainty into this case.

Moreover, I fear the dissent mischaracterizes the National Church's argument regarding the twenty-nine parishes with documentation reaffirming their allegiance to the National Church. In my view, the National Church is correct in its assertion that even without these individual reaffirmations made post-Dennis Canon, the relationships between the National Church and the parishes reveal that an express trust exists, created as the majority envisioned in *Jones v. Wolf.* That the National Church could locate twenty-nine reaffirmations made after the enactment of the Dennis Canon simply serves to point out the magnitude of the trial court's inexplicable error in finding no express trust was *ever* created by any of the parishes. However, the creation of a trust was never contingent upon the presence of these documents. Likewise, the dissent fails to give any effect to the trust imposed by the Diocesan canon. If the Dennis Canon has no effect on these seven parishes because it was unilateral, the same cannot be said about the Diocesan canon, which unequivocally bound its

affiliated parishes. Even without the Dennis Canon, the hierarchical structure of the National Church results in the Diocesan canon binding all affiliated parishes, including the seven in question.

Lastly, even accepting *arguendo* the dissent's assertion there was no writing to create an express trust binding the remaining seven parishes, I would find South Carolina's doctrine of constructive trusts would operate to impose a trust in favor of the National Church. A constructive trust arises "whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding the legal title." *Lollis v. Lollis*, 291 S.C. 525, 529, 354 S.E.2d 559, 561 (1987). The impetus to impose a constructive trust "results from fraud, bad faith, abuse of confidence, or violation of a fiduciary duty which gives rise to an obligation in equity to make restitution." *Id.* Importantly, in construing whether a constructive trust exists, this Court acts as the finder of fact in accordance with its own view of the evidence. *Id.* at 530, 354 S.E.2d at 561. For decades, if not longer, these parishes very clearly held themselves out as being affiliated with the National Church, agreed to be bound by its constitution and canons, attracted new members based on their affiliation with the Episcopal faith, participated in church governance, and in all other ways acted consistently with the National Church's structure. As mentioned earlier, parishes must agree to be bound by the National Church's constitution and canons before their buildings can be consecrated as churches of the Episcopal faith. In light of the evidence presented by both parties, I believe equity requires that a constructive trust be imposed, lest this Court condone the seven parishes camouflaging themselves as loyal adherents to the National Church without objection for nearly 30 years after the Dennis Canon was adopted, only to pivot and proclaim that relationship never existed when it no longer suited them. This is precisely the type of bad faith which constructive trusts were designed to reconcile.[22]

---

22. Justice Kittredge conscientiously questions the propriety of declaring the National Church the rightful holder of the parish property and depriving the disassociated parishioners of the churches where they once worshipped. I answer his question with another equally compelling question: May we deprive the remaining constituents of the Nation-

In sum, regardless of the effects, if any, of the absence of reaffirmations given by the seven parishes in response to the Dennis Canon, the record is rife with evidence that the National Church and Respondents structured their relationship in such a manner that Respondents were to act as trustees on behalf of the National Church. This Court must give effect to this trust under the neutral principles approach. The dissent's suggestion that there were no written documents evincing a trust executed by Respondents is not supported by the record. Even beyond its clear accession to the Dennis Canon by its actions in remaining affiliated with the National Church upon its enactment, the Lower Diocese indisputably manifested its acknowledgement that all parish property was held in trust for the National Church through its adoption of its Diocesan version of the Dennis Canon in 1987. Through the hierarchical structure of the organization, the adoption of the Diocesan canon was binding upon all of its parish affiliates. Only by ignoring the hierarchical framework of the National Church could one believe the parishes were not bound by this Diocesan canon.

Lastly I note, even if this Court resolved the matter solely under state corporate law, Bishop Lawrence disregarded corporate form and governance and therefore his actions were ineffectual.[23] In 1973 the nonprofit corporation was chartered,

---

al Church of this same property when, for decades, they attended services, donated funds, and invested time and labor into their respective parishes, all the while acting with the knowledge that the property was held in trust for the National Church in accordance with the organization's widely-known religious canons? The dissenting justices attempt to answer these questions looking narrowly at state property law, but it comes at the expense of the First Amendment freedoms guaranteed by the Constitution. Justice Kittredge perceives an inequity in requiring the breakaway constituents to leave their property behind, but as a Court we must be equally mindful of the past and present parishioners who devoted their time and talents to the individual parishes and relied on the fact that they were indivisible parts of the National Church.

**23.** Interestingly, a recent decision from a California appellate court affirmed title to disputed property in the National Church following a similar series of events in the Diocese of San Joaquin, where, as a parish rector, Lawrence joined an attempt to lead the diocese out of the National Church prior to his election as bishop in South Carolina. *See Diocese of San Joaquin v. Gunner*, 246 Cal.App.4th 254, 202 Cal.Rptr.3d

establishing the governance of the diocese. This is significant for two reasons.

First, the articles of incorporation expressly proclaimed the purpose of incorporation was "to continue the operation of an Episcopal Diocese under the Constitution and Canons of The Protestant Episcopal Church in the United States of America." Under a plain reading of the articles, the stated purpose incorporates by reference its alignment with the National Church, thereby subordinating the Diocese to the constitution and canons of the National Church. This stated intent to align and subordinate to the National Church is further supported by the Legislature's expressed intention to allow religious doctrine to control over corporate form. *See* S.C. Code Ann. § 33-31-180 (2006) ("If religious doctrine governing the affairs of a religious corporation is inconsistent with the provisions of this chapter on the same subject, the religious doctrine controls to the extent required by the Constitution of the United States or the Constitution of South Carolina, or both."). As such, the nonprofit corporation and those acting on its behalf are subject to all oaths and canons of the National Church. The exception for religious governance is critical here; while the trial judge found, and Justice Kittredge agrees, that Bishop Lawrence and the Breakaway Diocese made legally effective changes to the nonprofit corporation, that result can be reached only by disregarding section 33-31-180 and relying on the default provisions of the nonprofit code. However, because the National Church has promulgated its own set of rules concerning corporate governance, including changes to the bylaws, section 33-31-180 requires that those rules trump the default provisions of the nonprofit corporate code. Thus, the actions of Bishop Lawrence and the Breakaway Diocese— which indisputably did not comply with the National Church's governing rules—must be deemed ineffective.[24]

---

51 (2016). In that case, the court resolved the dispute based on state corporate principles, finding the attempts to amend the diocese's articles of incorporation and transfer property were ineffective. *Id.* at 65–67.

**24.** I must part company with Acting Justice Toal in her dogged effort to impose South Carolina civil law at any cost, which in my view runs roughshod over the National Church's religious autonomy and indeed, elevates the concept of neutral principles to heights heretofore un-

Second, as the director of a nonprofit organization, the bishop owes a fiduciary duty of care, loyalty, and good faith to the Protestant Episcopal Church in the Diocese of South Carolina. *See* S.C. Code Ann. § 33-8-300 (2006); *see also Menezes v. WL Ross & Co., LLC*, 403 S.C. 522, 531, 744 S.E.2d 178, 183 (2013) ("The duty of loyalty requires corporate officers and directors act in the best interest of the corporation and prioritize the corporation's interest above their own."). It is troubling that the dissent would base its holding on the application of corporate law, yet at the same time inexplicably fail to consider Bishop Lawrence's derogation of his fiduciary duties. Bishop Lawrence's actions in this matter undermined the very organization he was charged (and swore an oath) to serve, thereby ignoring his prescribed fiduciary duties.[25] This is evidenced by his issuance and delivery of quitclaim deeds [26] to disassociated parishes and instruction to those parishes not to immediately record the deeds; seeking out "friendly bankers" to discreetly handle church assets; and executing a formal residential lease of the diocesan property to himself in his individual capacity. Bishop Lawrence's subterfuge took place

known. My own view of the appropriate application of neutral principles would honor the constitutional mandate to not disturb matters of religious governance in order to maintain religious institutions' independence from state intrusions, a principle repeatedly described by the United States Supreme Court as radiating "a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, [the] power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 185–86, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)).

25. In fact, when questions arose surrounding Bishop Lawrence's loyalty to the National Church and jeopardizing his potential ordination, he expressly represented to the National Church his intention to abide by its doctrines and teachings. In a letter dated March 7, 2007, Bishop Lawrence wrote, "I will heartily make the vows conforming to the doctrine, discipline and worship of the Episcopal Church, as well as the trustworthiness of the holy scriptures. So to put it as clearly as I can, my intention is to remain in the Episcopal Church, period."

26. Indeed, if Bishop Lawrence himself believed the National Church held no interest in the property of the various parishes, there would have been no reason for him to issue quitclaim deeds.

over the course of several years, all the while keeping his actions secret from the National Church to which he had vowed his loyalty. Further, the act of amending the corporate form was not in the interest of the corporation because it was contrary to the constitution and canons of the National Church. Based upon both the articles of incorporation and the fiduciary duty owed to the nonprofit corporation, Bishop Lawrence acted outside his scope and authority in direct violation of his oath, the canons, and corporate governance. Therefore, any attempts by Bishop Lawrence to unilaterally alter the Lower Diocese's relationship with the National Church cannot be given any effect.

## CONCLUSION

Based on our doctrine of deference to ecclesiastical authority, the Appellants represent the true Lower Diocese of the Protestant Episcopal Church in South Carolina and are therefore entitled to all property, including Camp Saint Christopher and the emblems, seals, and trademarks associated with the National Church. This holding is based on the National Church's recognition of Charles vonRosenberg as its Bishop and the express trust imposed on Respondents' property by the Dennis Canon, as well as on state corporate law principles.[27]

### CHIEF JUSTICE BEATTY:

Given the divergent opinions, I am compelled to write separately because I believe my position is that of a centrist between the members of the Court. While I agree The Episcopal Church ("TEC") is hierarchical, I disagree with the analy-

---

**27.** To clarify the dissent's summary of this case's resolution, I join Acting Justice Pleicones and Chief Justice Beatty in reversing the trial court as to the twenty-nine parishes that documented their reaffirmation to the National Church, but Chief Justice Beatty joins Acting Justice Toal and Justice Kittredge with respect to the remaining seven parishes. Four justices agree that the Dennis Canon created an enforceable trust as envisioned in *Jones*, but Justice Kittredge departs from the majority and would find that the trust was revoked at the time of the schism. Moreover, though Acting Justice Pleicones and I believe ecclesiastical deference is required in this case, both of our opinions find that all thirty-six parishes acceded to the Dennis Canon such that a legally cognizable trust was created in favor of the National Church.

sis and much of the result reached by the majority. Instead, applying neutral principles of law, I would find those parishes that did not expressly accede to the Dennis Canon should retain ownership of the disputed real and personal property.[28] Consequently, I concur in part and dissent in part.

As evident by all of the well-written opinions, this case evokes strong views from each member of this Court. I cannot deny that each opinion is impassioned and persuasive. Although I appreciate the merits of each view, I do not believe that emotion or religious doctrine should control purely legal analysis. Rather, distilled to its simplest form, this case involves a property dispute. Thus, irrespective of the doctrinal context in which the case arose, this legal issue is our sole concern.

In resolving this issue, I am guided by the neutral principles of law approach enunciated in *All Saints* and *Jones* and aptly discussed by former Chief Justice Toal. *See All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of South Carolina*, 385 S.C. 428, 444, 685 S.E.2d 163, 172 (2009) (applying neutral principles of law in disputes arising between a congregation and its denomination over title to church property and between the congregation's members over corporate control; stating, "the neutral principles of law approach permits the application of property, corporate, and other forms of law to church disputes"); *Jones v. Wolf*, 443 U.S. 595, 603-04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (holding that a state is constitutionally entitled to adopt neutral principles of law approach as a means of adjudicating church disputes; recognizing that "[t]he primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organizations and polity").

Based on the neutral principles of law approach, I believe our analysis requires a discussion of the following sequential questions: (1) what is the legal efficacy of the Dennis Canon?; (2) does accession to the Dennis Canon equate to a creation of a legally cognizable trust?; and (3) what is the import of a decision not to accede to the Dennis Canon?

---

**28.** I express no opinion concerning the rights to the service marks as I believe this determination should remain with the federal court.

The answer to each of these questions is not dependent on the doctrinal validity of the Dennis Canon or a determination that TEC is hierarchical. In fact, I look no further than our state's property and trust laws to determine whether the purported trust created by the Dennis Canon comports with the requirements of either an express or constructive trust.

Although this writing arguably complies with the statute of frauds, like Justice Toal, I would find that, standing alone, it is not sufficient to transfer title of property or create an express or constructive trust under South Carolina law. *See* S.C. Code Ann. § 62-7-402(a)(2) (2015) ("To be valid, a trust of real property, created by transfer in trust or by declaration of trust, must be proved by some writing signed by the party creating the trust. A transfer in trust of personal property does not require written evidence, but must be proven by clear and convincing evidence, pursuant to Section 62-7-407."). Significantly, in the instant case, the party attempting to create the trust was not the settlor. Instead, TEC was merely the drafter of the Dennis Canon as it had no interest in the property intended to comprise the corpus of the trust. Admittedly, there is no requirement that the drafter of a trust agreement be the settlor; however, in the absence of this status, TEC was nothing more than a demanding scrivener.

Further, in my view, the Dennis Canon, by itself, does not have the force and effect to transfer ownership of property as it is not the "legally cognizable form" required by *Jones. See Jones,* 443 U.S. at 606, 99 S.Ct. 3020 (recognizing that courts must give effect to churches' intent when deeds and trust documents executed by the general church "provided [the documents] are embodied in some legally cognizable form"). While the Dennis Canon may use the term "trust," this word alone does not unequivocally convey an intention to transfer ownership of property to the national church or create an express or constructive trust. *See Lollis v. Lollis,* 291 S.C. 525, 530, 354 S.E.2d 559, 561 (1987) ("In order to establish a constructive trust, the evidence must be clear, definite, and unequivocal.").

Yet, TEC argues that the parishes' accession to the Dennis Canon created the trust. Assuming that each parish acceded in

writing, I would agree. In my view, the Dennis Canon had no effect until acceded to in writing by the individual parishes.

Thus, in contrast to the majority, I would find the parishes that did not expressly accede to the Dennis Canon cannot be divested of their property. Because there was no writing purporting to create a trust and they took no other legal action to transfer ownership of their property, I believe these parishes merely promised allegiance to the hierarchical national church. Without more, this promise cannot deprive them of their ownership rights in their property. However, I agree with the majority as to the disposition of the remaining parishes because their express accession to the Dennis Canon was sufficient to create an irrevocable trust.[29]

In conclusion, I readily acknowledge the controversy surrounding this case and the ramifications of the Court's decision. Even so, my decision cannot be driven by personal beliefs or a desired result. Strictly applying neutral principles of law, which I believe this property dispute mandates, I would affirm in part and reverse in part the order of the circuit court.

## JUSTICE KITTREDGE:

Because I believe the proper application of "neutral principles of law," as enunciated in *Jones v. Wolf*,[30] demands that all thirty-six local parishes retain ownership and control of their property, I would affirm the trial court in result.[31]

---

**29.** Additionally, I would find "The Trustees of the Protestant Episcopal Church" in the Diocese of South Carolina should retain title to Camp St. Christopher as my decision in no way alters the clear language of the 1951 deed conveying ownership of this property. The conveyance of Camp St. Christopher was for the explicit purpose of furthering "the welfare of the Protestant Episcopal Diocese of South Carolina." In my view, the disassociated diocese can make no claim to being the successor to the Protestant Episcopal Church in the Diocese of South Carolina.

**30.** 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

**31.** I join Justice Toal's opinion, save for Part II.C.1's conclusion that no trusts were created as to the twenty-eight churches that acceded to the 1979 Dennis Canon.

This Court may—indeed, must—resolve this property dispute on the basis of civil law, without regard to religious doctrine or practice.[32] I first address the twenty-eight local churches that acceded in writing to the 1979 Dennis Canon. Justice Toal presents a scholarly analysis of South Carolina trust law. I take no exception to her presentation of general trust-law principles, and I join Justice Toal in result. However, for reasons I explain below, it seems to me that *Jones v. Wolf* creates some uncertainty as to what "neutral principles of law" means in the context of a church property dispute. As a result, I am not persuaded that a court may, within constitutional boundaries, simply apply general state trust law to decide this case. As best as I can interpret and apply *Jones v. Wolf*, it is my view that a trust was created as to the property of the local churches that acceded to the 1979 Dennis Canon. In what appears to be a pure application of neutral principles of law, Justice Toal would hold that accession to the 1979 Dennis Canon "was not a legally binding action to impose a trust under South Carolina law." While I agree the national church could not unilaterally declare a trust over the property of the local churches, I would join Chief Justice Beatty and hold that the local churches' accession to the 1979 Dennis Canon was sufficient to create a trust in favor of the national church. *See Jones v. Wolf,* 443 U.S. 595, 606, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (noting that courts must give effect to churches' intent when churches structure property arrangements "in some legally cognizable form").

I focus my comments on express trusts in light of First and Fourteenth Amendment considerations, for that is the basis on which the national church seeks to acquire control over the property of the local churches. I do not depart from Justice Toal's position lightly, for she faithfully interprets South Car-

---

**32.** By framing the issue before the Court as being which diocese is the "true" diocese of the national church, the lead opinion and concurrence preordain the result, for that is a question this Court clearly lacks authority to answer. *See id.* at 602, 99 S.Ct. 3020 ("[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice."). Moreover, quoting from a case cited by Justice Hearn, "recognizing the Episcopal Church as hierarchical does not resolve a property dispute such as the one here." *Diocese of San Joaquin v. Gunner,* 246 Cal.App.4th 254, 202 Cal.Rptr.3d 51, 63 (2016).

olina's trust law as it applies to typical property disputes. Were the Court in the instant case permitted to apply the law of express trusts as we ordinarily would, the suggestion that *any* of the thirty-six local churches created a trust in favor of the national church would be laughable. Yet I find *Jones v. Wolf* teaches that a court must treat religious organizations differently in accordance with constitutional limitations and considerations. The burden the law imposes on a religious organization in creating a trust is reduced.

In resolving church property disputes, we learn from *Jones v. Wolf* that "neutral principles of law" is a bit of a misnomer, for it is not really "neutral" after all. If it were, why would the Supreme Court have taken pains to mandate that the burden imposed on a religious organization be "minimal"? *See id.* at 606, 99 S.Ct. 3020. And why would the Supreme Court have specified ways churches could establish an express trust, without indicating concern for whether those methods were valid under any state's existing trust law? *See id.* at 603, 99 S.Ct. 3020. I believe where there is a dispute involving a local church's property rights *vis a vis* a national religious society and an affiliated local religious body, constitutional considerations require courts to analyze and resolve the property dispute through the framework of a "minimal burden" on the national religious organization. *See id.* at 606, 99 S.Ct. 3020.

Two passages from *Jones v. Wolf* lead me to this conclusion. First, the Court in *Jones v. Wolf* spoke forcefully about the many advantages of the neutral principles of law approach:

The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, *well-established* concepts of trust and property law *familiar to lawyers and judges.* It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. *Through appropriate reversionary clauses and trust provisions,* religious societies can specify what is to happen to church property in the event of a particular

contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy.

*Id.* at 603, 99 S.Ct. 3020 (emphasis added).

If this were the sum total of what *Jones v. Wolf* said about neutral principles, I would without hesitation join Justice Toal in full. But the *Jones v. Wolf* Court went further. Specifically, the majority in *Jones v. Wolf* addressed the dissent, which preferred a rule of compulsory deference.[33] In declining to mandate a rule of compulsory deference, the Court rejected the dissent's argument that the neutral-principles method would frustrate the free-exercise rights of the members of a religious organization. The Court explained:

> The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal.* And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in *some legally cognizable form.*

*Id.* at 606, 99 S.Ct. 3020 (emphasis added). It is this passage in particular that causes me to part company with Justice Toal's adherence to the normal rules of the road concerning the creation of express trusts.

---

**33.** In my view, Justices Pleicones and Hearn cast their votes based on the rule of compulsory deference that was rejected in *Jones v. Wolf. See id.* at 604–05, 99 S.Ct. 3020 (noting the dissent in that case "would insist as a matter of constitutional law that whenever a dispute arises over the ownership of church property, civil courts must defer to the authoritative resolution of the dispute within the church itself" (internal quotation marks omitted)).

As I interpret the above passages, *Jones v. Wolf* imposes a minimal burden on a national religious institution in the creation of what courts must recognize as an express trust over the property of an affiliated local church. Thus, while general principles of law mark the starting point in resolving a church property dispute, the harder question is determining where to draw the finish line—just how much of the general law must a religious organization follow?

Here, as Justice Toal forcefully points out, the national church turns the law of express trusts on its head, as no local church (as "settlor") took steps to create a trust, but merely responded to ("acceded" to) changes to church governance documents proposed by the national church. Nonetheless, given the Supreme Court's imprimatur concerning the minimal burden that may be imposed on a religious organization, I conclude that a trust was created in favor of the national church over the property of the twenty-eight local churches that acceded in writing to the 1979 Dennis Canon.

The next question is whether these twenty-eight churches were irrevocably bound by the 1979 Dennis Canon. The national church accepted the invitation of *Jones v. Wolf* and created the equivalent of an express trust with a minimal burden. If the national church had followed state law as described by Justice Toal and actually created an express trust in the normal course, the national church would have a strong argument on the issue of revocability. But the national church cannot escape the method and manner in which it chose to create a trust, that is, by placing the trust provision in a church governance document that is inherently amendable.

Justice Hearn invokes what she calls the "common law default rule of irrevocability" to argue that the local churches were eternally bound by the 1979 Dennis Canon. However, this "default rule" is a presumption that is susceptible of evidence of a contrary intent. In my judgment, as explained below, the circumstances here overcome the presumption of irrevocability.

"If the meaning of the trust instrument is uncertain or ambiguous as to whether the settlor intended to reserve a power of revocation, evidence of the circumstances under

which the trust was created is admissible to determine its interpretation." Restatement (Second) of Trusts § 330 cmt. b (1959). Among the factors that could indicate a settlor intended to reserve a right of revocation are the character of the trust property, the relationship between the settlor and the beneficiary, and the reasons that induced the settlor to create the trust. *E.g.*, *id.* §§ 330 cmt. c, 332 cmt. a (1959). I believe these factors militate in favor of the trust's revocability.[34] The disputed property includes land and buildings to which the local churches have long held title, in some cases for centuries. And the impetus to create the trust came not from the settlors (the local churches), but the beneficiary (the national church). Furthermore, I would not myopically invoke the common law presumption of irrevocability where, as here, the national organization seeking to impose the trust placed the trust language in a document that is by its very nature subject to amendment. As the legislature observed in a comment to the South Carolina Trust Code, "An unrestricted power to amend may also include the power to revoke a trust." S.C. Code Ann. § 62-7-602 reporter's cmt. (Supp. 2016).

In my view the circumstances described above—a trust provision drafted by a beneficiary and placed in an amendable church governance document—combine to overcome the common law presumption of irrevocability. As a result, I would hold as a matter of South Carolina law that under these facts the local churches were not forever bound by the trust provision, and they retained the authority to withdraw their accession to it.[35] That is precisely what they did—through proper

---

34. I note that there is significantly less justification for adhering to the common law presumption of irrevocability where, as in this case, it is not consistent with the rationale behind the presumption—"[t]he theory . . . that most trusts are created by way of gift and a completed gift may not be rescinded by the donor merely by reason of a change of mind." Mary F. Radford, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 998, at 235 (3d ed. 2006). Here, the trust was clearly not intended to effectuate a gift *to* the beneficiary (the national church); rather, the trust was drafted *by* the national church (the beneficiary) to benefit the national church. In addition, the settlors (the local churches) retained ownership of and continued to exercise exclusive control over the property.

35. I reject any argument that the national church would be required to consent to any amendment of the trust provision, for the national

action, by those with proper authority, the Diocese and local churches withdrew their accession to the 1979 Dennis Canon in accordance with state law prior to the filing of this litigation.[36] Therefore, I would affirm the trial court in result and hold that those churches that had previously agreed to the 1979 Dennis Canon are no longer bound by it.[37]

I turn now to the eight churches that *never* acceded to the 1979 Dennis Canon. Today, this Court allows (by a three-to-

---

church would never consent and the result would be a de facto irrevocable trust. Chief Justice Beatty accurately describes the national church as "nothing more than a demanding scrivener." Allowing the national church to invoke the "minimal burden" approach of *Jones v. Wolf* in the creation of a trust is not a license to completely turn our back to neutral principles of law. If it is determined that a settlor retains the right to revoke a trust and the manner of revocation is not specified, the trust may be revoked " '*in any manner* which shows a clear and definite purpose *on the part of the settlor* of the trust to revoke the same.' " *Peoples Nat'l Bank of Greenville v. Peden*, 229 S.C. 167, 171, 92 S.E.2d 163, 165 (1956) (emphasis added) (quoting *Broga v. Rome Tr. Co.*, 151 Misc. 641, 272 N.Y.S. 101, 106 (Sup. Ct. 1934)); *see also* S.C. Code Ann. § 62-7-602 reporter's cmt. ("Where the right to revoke [is] reserved and no particular mode [is] specified, any mode sufficiently showing an intention to revoke [is] effective.").

**36.** There is no question that Bishop Lawrence and the local churches had the *legal* authority at the time to take the actions they did. Justice Hearn's reliance on *Diocese of San Joaquin v. Gunner* is misplaced. In that case the attempted transfers of diocesan property by Bishop Schofield were ineffective because they "occurred after Schofield had been removed as bishop of the Diocese." *Diocese of San Joaquin*, 202 Cal.Rptr.3d at 59. Not only that, but the entity to which Bishop Schofield attempted to transfer the property did not exist because he lacked authority under California law to change the diocese's corporate name. *Id.* at 65–67. Conversely, notwithstanding the unrelenting vilification of Bishop Lawrence, it is manifest that Bishop Lawrence was duly ordained, appointed, and authorized to act at the time the property transfers and corporate amendments occurred, and they were conducted in accordance with South Carolina law.

**37.** Despite Justice Hearn's claim to the contrary, reaching this conclusion does not require me to ignore the Nonprofit Corporation Act's exception for religious organizations. *See* S.C. Code Ann. § 33-31-180 (2006). Section 33-31-180 grants supremacy to a religious corporation's governing documents only "to the extent required by the Constitution of the United States or the Constitution of South Carolina." *Id.* Therein lies the nub of this dispute, as "[t]he exact scope of constitutional [l]imitations is less than clear and is subject to debate." *Id.* § 33-31-180 official cmt. (2006). Justice Hearn and I simply disagree as to what the Constitution requires.

two vote with Chief Justice Beatty casting the deciding vote) the eight churches that were never subject to the 1979 Dennis Canon to keep their property. That is remarkable, for by a single vote the rule of law is preserved and property ownership is protected.

Prior to today's opinion, the national church's focus in this property dispute has been whether the 1979 Dennis Canon imposed an express trust on the property of the local churches. The national church throughout this litigation has relied on the 1979 Dennis Canon and the law of *express* trusts to support its claim of ownership over the church property of the thirty-six local parishes in question. But it is undisputed that eight of the local parishes were never subject to the 1979 Dennis Canon. Yet two members of this Court would go further and transfer to the national church ownership of the property of the eight churches that never agreed to the Dennis Canon. That is stunning. The effort by two members of this Court to strip the property from these eight churches confirms Justice Toal's observation concerning their motivation to "reach[ ] a desired result in *this* case."

I first address the concurrence's view that the Court may not even consider the status of the eight non-acceding churches on issue preservation grounds. The answer to this assertion is simple: "The appellate court may affirm any ruling, order, decision or judgment upon *any* ground(s) appearing in the Record on Appeal." Rule 220(c), SCACR (emphasis added). The local churches, as winners at trial and respondents on appeal, were not required to play "what if we lose" in their briefs or during oral argument.

Moreover, as Justice Toal points out, the national church itself brought up the non-acceding churches. The national church acknowledged to this Court that only some of the thirty-six local churches involved in this litigation "made express promises in their governing documents to comply with the [n]ational [c]hurch's rules" after the national church adopted the 1979 Dennis Canon.[38] That obviously makes an

---

38. The national church acknowledged in its brief that "29 of the 36 parishes made express promises in their governing documents to comply with the [n]ational [c]hurch's rules *after* those rules had been amended to include the Dennis Canon in 1979." Brief of Appellants at

issue out of the churches that did *not* make such promises. Although the concurrence may feign surprise at a majority of this Court addressing the status of the eight non-acceding churches, the national church surely cannot.

As to the merits of the national church's claim to the property of the eight non-acceding churches, in my judgment the dissent on this issue (Justices Pleicones and Hearn) misreads the Supreme Court's *observation* in *Jones v. Wolf* that complying with state property and trust laws would not impose an undue free-exercise burden on religious organizations as a *command* that states completely ignore their existing laws to placate hierarchical national churches. Properly applied to the non-acceding churches, there is no neutral principle of law that supports the conclusion Justices Pleicones and Hearn desire. As Chief Justice Beatty and Justice Toal note in their respective opinions, the framework set forth in *Jones v. Wolf* makes clear that, because of well-established South Carolina law, an express trust [39] cannot be imposed on the property of those eight churches that never adopted the Dennis Canon. *See* S.C. Code Ann. § 62-7-401(a)(2) (Supp.

38. The same point was repeated by the national church's counsel during oral argument.

39. I do not address constructive trusts, because *that* issue is not preserved for our review. The national church has relied exclusively on the law of express trusts throughout this litigation. The national church mentioned the term constructive trust just once in its fifty-one-page brief and not at all in its twenty-five-page reply brief. The sole reference to a constructive trust was a conclusory statement that "South Carolina's Trust Code and common law of constructive trusts" require the Court to enforce the Dennis Canon against all thirty-six parishes. Accordingly, the law of constructive trusts cannot serve as a basis to reverse the trial court. *See, e.g., Brouwer v. Sisters of Charity Providence Hosps.*, 409 S.C. 514, 520 n.4, 763 S.E.2d 200, 203 n.4 (2014) (refusing to consider an argument in the appellant's brief that was "conclusory" and "not supported by any authority"); *First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting a claim is deemed abandoned when the appellant fails to support it with arguments or citations to authority); *cf. I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 421–22, 526 S.E.2d 716, 724 (2000) (stating that although an appellate court may *affirm* a decision on any ground appearing in the record, "[a]n appellate court may not, of course, *reverse* for any reason appearing in the record"). I add that the phrase "constructive trust" was never mentioned in the approximately hour-long oral argument before this Court. In any event, Justice Toal correctly explains why the law of constructive trusts provides no lifeline to the national church.

2016) (stating that express trusts in real property "must be proved by some writing signed by the party creating the trust"); *see also Beckham v. Short*, 298 S.C. 348, 349, 380 S.E.2d 826, 827 (1989) (noting that under the then-applicable statute, "trusts in lands not manifested and proved by some writing signed by the party declaring the trust are utterly void and of no effect" (citation and internal quotation marks omitted)).

Nonetheless, the national church, with two members of this Court in support, desires the property of these eight churches by virtue of a "trust" the churches never acceded to. In short, these eight churches have never agreed to anything in a "legally cognizable form" indicating the slightest intention of transferring ownership of their property. Yet if Justices Pleicones and Hearn had their way, these eight local churches would lose their property today. Under this approach, the 1979 Dennis Canon was unnecessary, for the national church would control the property of all local churches simply because the national church "said so." Perhaps this explains the wisdom of the *Jones v. Wolf* majority in rejecting the rule of compulsory deference that Justices Pleicones and Hearn invoke today.

By a single vote, these eight local churches retain ownership of their property. The message is clear for churches in South Carolina that are affiliated in any manner with a national organization and have never lifted a finger to transfer control or ownership of their property—if you think your property ownership is secure, think again.

I dissent in part (concerning the twenty-eight churches) and concur in part (concerning the eight non-acceding churches).

ACTING JUSTICE TOAL:

This is a very difficult dispute in which the trial court was asked by the plaintiffs to declare the status of title to church property. Just as the litigants in this matter are in disagreement about the legal issues raised in this case, so too our Court is sharply divided in our opinions about this matter. These divisions are the result of sincerely held views about the law, but we are united in our deep respect for each other's views and the sincerity which informs our opinions. The

various writings are powerfully written and deeply researched. I am regretful that I cannot join my colleagues in the majority [40] whose legal ability I respect so highly. Therefore, I respectfully dissent.[41] With regard to the question of who owns the disputed real and personal property, I would hold that the plaintiffs are the title owners in fee simple absolute to this property under South Carolina law and would affirm the decision of the trial court. With regard to the question of whether the defendants infringed on the plaintiffs' service marks, I would narrowly affirm the trial court under state law and defer to the federal court to answer any issues in this matter in which federal copyright and trademark law may be applicable.

## INTRODUCTION

The main points upon which I depart from my brothers and sister in the majority are as follows:

(1) I would rely on over three hundred years of settled trust and property law in South Carolina to declare title to these disputed properties in the plaintiffs' favor, as I believe the effect of the majority's decision is to strip a title owner of its property and give it to an organization with which the property owner has no affiliation, relying on documents and practices that do not create a trust under South Carolina law.

(2) The lead opinion and concurrence [42] (unsuccessfully) attempt to strip eight parishes of their titled property,

---

**40.** As there are five writings covering different aspects of this case, I refer to "the majority" when discussing the collective decisions of Chief Justice Beatty, Justice Hearn, and Acting Justice Pleicones.

**41.** I likewise concur in the result reached by Justice Kittredge in his dissent. Justice Kittredge believes that in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the United States Supreme Court dictated a national church need not strictly adhere to a state's neutral trust law to establish a cognizable property interest in its constituents' holdings. I cannot agree that complying with ordinary trust law requirements is overly burdensome, or that enforcing such requirements would violate the holding in *Jones*. However, Justice Kittredge nonetheless takes a reasoned approach to the applicability of our state's trust law in this instance. I therefore concur in the result he reaches.

**42.** For sake of clarity, I refer to Acting Justice Pleicones's opinion as the lead opinion and Justice Hearn's opinion as the concurrence. I refer

despite the fact that these parishes have never agreed to or signed any document purporting to affect their ownership interests.

(3) I believe the lead opinion is not consistent with the provisions of South Carolina statutory law regarding the organization and management of non-profit and charitable corporations.

(4) I believe the lead opinion uses an equitable standard of review in this action which is not consistent with the pleadings in this matter, and thus, misstates the question before this Court.

(5) In my view, the lead opinion is contrary to settled First Amendment precedents from the United States Supreme Court.

(6) Although the lead opinion specifically relies on and upholds our prior precedents—most importantly *All Saints Parish Waccamaw v. Protestant Episcopal Church in the Diocese of South Carolina*, 385 S.C. 428, 685 S.E.2d 163 (2009)—essentially the effect of its holding is to reverse the result in *All Saints*.

In my view, the result stemming from the majority's various decisions is a distinct departure from well-established South Carolina law and legal precedents, a departure which appears to be driven by a sole purpose: reaching a desired result in *this* case. However, the Court's decision here affects law governing *all* trusts and titles as well as the operation of *all* non-profit and charitable corporations in this State. Thus, the effects of the majority's decision are sure to be pervasive, and for this reason, I feel compelled to write separately.

## I. PARTIES AND POSTURE OF THE DISPUTE

The plaintiffs in this case are: (1) thirty-six individual church parishes, incorporated under South Carolina law and located in southeast South Carolina (the plaintiff parishes); (2) the Protestant Episcopal Church in the Diocese of South Carolina, a South Carolina corporation (the disassociated diocese); and (3) the Trustees of the Protestant Episcopal Church in South Carolina, a South Carolina corporation (the trustee

---

to Chief Justice Beatty's opinion as the Chief Justice's partial concurrence. I refer to Justice Kittredge's dissent as the Kittredge dissent.

corporation). It is undisputed that the individual plaintiff-parish corporations hold title in fee simple absolute to their parish's real and personal property. It is also undisputed that the disassociated diocese is the title holder of its service marks, seals, and emblems; and that the trustee corporation holds title in fee simple absolute to Camp St. Christopher.

The defendants in this case are: (1) the National Episcopal Church, a voluntary unincorporated association (the national church); and (2) the Episcopal Church of South Carolina, a South Carolina corporation affiliated with the national church (the associated diocese). As to the relationship between the plaintiffs and defendants, the disassociated diocese was once a member of the national church, and the plaintiff parishes were and are affiliated with the now-disassociated diocese. The associated diocese is comprised of the parishioners and churches who chose to continue their association with the national church when the disassociated diocese disaffiliated from that organization.

Prior to the Revolutionary War, the South Carolina Commons House of Assembly created colonial parishes as part of the Church Act, granting the parishes both civil and ecclesiastical powers over the land and people. These colonial parishes were part of the Church of England, under the authority of the Bishop of London. However, the Church of England did not pay for the services provided to parishioners, nor did it pay for the properties used by the churches located within the parishes. Rather, the various colonial churches were locally funded, and the properties associated with them were titled in the local churches' names.

In 1778, the first state constitution disestablished the Church of England as the state church and empowered existing parishes to petition the legislature for incorporation. The local churches previously under the aegis of the Church of England disassociated from that Church, and many sought to be legislatively incorporated.

Later, in 1785, the disassociated diocese formed as an unincorporated association of former Anglican churches. In 1786, the twelve churches that then comprised the disassociat-

ed diocese adopted the first diocesan constitution.[43] In this constitution, the churches—some of which predated the formation of the diocese by more than 100 years—reaffirmed that they wished to remain independent from the Church of England in ecclesiastical and civil matters.[44] Three years later, in 1789, the disassociated diocese and six other states' dioceses founded and voluntarily associated with the national church under terms dictated by the dioceses.[45]

Except for a five year hiatus during the Civil War,[46] the disassociated diocese continued its voluntary association with the national church until October 2012. Throughout the history of the disassociated diocese's voluntary association with the national church, the plaintiff parishes likewise voluntarily associated with the disassociated diocese, and therefore, were only affiliated with the national church through their membership in the diocese. Both before and after the association, the plaintiff parishes and their parishioners worshipped on property titled in the individual parishes' names, which the parishes owned in fee simple. Moreover, for as long as the disassociated diocese was affiliated with the national church, the national church and its dioceses, including the disassociated diocese, implemented various changes in their respective constitutions and canons, which are the governing documents for the organizations.

In 1973, the disassociated diocese incorporated, becoming a non-profit corporation. Initially, the diocese's corporate purpose was "to continue the operation of an Episcopal Diocese

---

43. These churches included St. Philip's Church, Charleston; St. Michael's Church, Charleston; Prince Frederick, Plantersville; St. James' Church, Goose Creek; St. Thomas' Church, Berkeley County; St. Bartholomew's Church, Jacksonboro; Prince William's Church, Beaufort County; St. Andrew's Church, Mt. Pleasant; the Church of the Parish of St. Helena, Beaufort; the Episcopal Church of the Parish of Prince George Winyah, Georgetown; St. John's Parish, Colleton County; and the Episcopal Church of Christ Church Parish, Mt. Pleasant. Some of these churches are parties to this action.

44. Thus, these plaintiff parishes did not transfer title to their properties to the disassociated diocese.

45. These states included New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, and South Carolina.

46. Title to the properties owned by the disassociated diocese and its churches did not change hands either before or after the Civil War.

under the Constitution and Canons of [the national church]."
Similarly, the trustee corporation's initial bylaws stated that it
would carry out its duties under the authority of the national
church's constitution and canons. Likewise, many of the indi-
vidual plaintiff parishes had similar provisions in their govern-
ing documents.

In 1979, the national church enacted the so-called "Dennis
Canon," which reads:

All real and personal property held by or for the benefit of
any Parish, Mission or Congregation is held in trust for this
Church and the Diocese thereof in which such Parish,
Mission or Congregation is located. The existence of this
trust, however, shall in no way limit the power and authority
of the Parish, Mission or Congregation otherwise existing
over such property so long as the particular Parish, Mission
or Congregation remains a part of, and subject to this
Church and its Constitution and Canons.

In 1987, the disassociated diocese adopted its own version of
the Dennis Canon.[47] The defendants contend that twenty-eight
of the plaintiff parishes "acceded," in some form or another,
either to the local or national version of the Dennis Canon.[48]
Eight of the plaintiff parishes never acceded to either Dennis
Canon.[49] In all cases, however, the defendants concede that no
formal trust documents were ever executed by the plaintiff
parishes, the disassociated diocese, or the trustee corporation

47. That version of the Dennis Canon states: "All real and personal
property held by or for the benefit of any Parish, Mission, or Congrega-
tion is held in trust for [the national church] *and the [disassociated
diocese]*. The existence of this trust, however, shall in no way limit the
power and authority of the Parish, Mission, or Congregation existing
over such property so long as the particular Parish, Mission, or Congre-
gation remains a part of, and subject to, [the national church] *and the
[disassociated diocese]*." (Emphasis added).

48. Some of these "accessions" occurred before the 1979 proclamation
of the Dennis Canon by the national church. Some occurred before
1987 when the now-disassociated diocese adopted its own version of
the Dennis Canon. Some occurred after both actions.

49. The defendants do not reference any documentation of accession
(and I have found none in the record) for the following plaintiff
parishes: Christ the King, Waccamaw; St. Matthews Church, Darling-
ton; St. Andrews Church–Mt. Pleasant Land Trust; St. Paul's Episcopal
Church of Conway; The Episcopal Church of the Parish of Prince
George Winyah, Georgetown; the Parish of St. Andrew, Mt. Pleasant;

in favor of the national church specifying the title holder as the settlor or creator of the trust and the national church as the *cestui que* trust or holder of the beneficial title of the trust. Instead, the defendants maintain that the Dennis Canon and other specific actions of the plaintiffs in amending their governing documents throughout their history (including before the existence of the Dennis Canon) "imposed" a trust in favor of the defendants.

In 2009, with the General Convention's approval, Bishop Lawrence became the ecclesiastical head of the now-disassociated diocese. Shortly thereafter, a doctrinal dispute concerning marriage and the priesthood developed between the national church and the disassociated diocese, resulting in what was described as a "cold war" between the entities.

As a result, the disassociated diocese, the trustee corporation, and the plaintiff parishes began to make significant changes to their corporate organizational structures and governing documents, in accordance with the civil laws by which the disassociated diocese and the national church structured its affairs in South Carolina. For example, in March 2010, the trustee corporation amended its bylaws to remove all references and accessions to the national church's constitution and canons. Similarly, in October 2010 and February 2011, the disassociated diocese amended its constitution and canons to remove its accession to the Dennis Canon and other canons of the national church, and to adopt a new corporate purpose: "to continue operation under the Constitution and Canons of [the disassociated diocese]." While these changes were being made, Bishop Lawrence was the duly-elected (by the national church) corporate officer empowered with the authority to undertake these actions in South Carolina under state law.[50]

---

St. John's Episcopal Church of Florence; and St. Matthias Episcopal Church, Summerton. The defendants contend that St. Matthias and St. John's in effect "acceded" to the Dennis Canon because each was deeded some real property by the now-disassociated diocese that contained language tantamount to accession. However, neither of these churches ever directly acceded to the local or national version of the Dennis Canon, and the disassociated diocese disclaimed any interest in these churches' real property by quitclaim.

**50.** To the extent Justice Hearn's concurrence focuses on the alleged nefarious motives and actions of Bishop Lawrence and other parish

During the same time period, the disassociated diocese issued a series of quitclaim deeds to the plaintiff parishes, disclaiming any interest it might have in the plaintiff parishes' properties. Further, the disassociated diocese applied to South Carolina's Secretary of State to register five "service marks"[51]: three similar names for the disassociated diocese, and two pictures of the diocesan seal.[52] All of the amendments and registrations were accomplished through publicly-recorded legal documents. Additionally, at some point during this time, the national church had actual knowledge of these changes, but chose not to revoke Bishop Lawrence's authority within the church.

In September 2012, the national church's disciplinary board found that Bishop Lawrence had abandoned the national church, and recommended disciplinary action against him. On October 17, 2012, upon discovering the disciplinary board's recommendation to sanction Bishop Lawrence, the disassociated diocese ended its association with the national church. The disassociated diocese's standing committee then amended its corporate bylaws to add provisions prohibiting anyone from challenging the authority of the board of directors or removing any member of the board, including Bishop Lawrence, except by the process provided in the diocesan bylaws.

Thereafter, loyalists within the disassociated diocese who remained committed to the teachings of the national church called a meeting.[53] At this meeting, the defendants discussed

officers and members of the disassociated diocese, as will be explained, *infra*, it is my opinion that such examination and recitation is inappropriate. Because I believe this dispute should be resolved on neutral principles of law, reliance on this ecclesiastical and doctrinal background is improper to resolving this dispute.

51. Service marks are similar to trademarks, but whereas trademarks identify and distinguish a person's or business's *goods*, service marks identify and distinguish a person's or business's *services*. *Compare* S.C. Code Ann. § 39-5-1105(7) (1976) (defining "service mark"), *with* S.C. Code Ann. § 39-5-1105(9) (1976) (defining "trademark").

52. In 2011, several of the plaintiff parishes also registered service marks.

53. The defendants called the meeting by emailing clergy from the disassociated diocese and inviting them to a clergy day purportedly

replacing the disassociated diocese with a newly-created diocese—the associated diocese—and placing Bishop Charles vonRosenberg at its helm.

On November 17, 2012, the disassociated diocese held a Special Convention, at which the plaintiff parishes and their clergy overwhelmingly voted to affirm the diocese's disaffiliation from the national church, as well as voting to remove the diocese's accession to the national church's constitution. On January 26, 2013, following the national church's acceptance of Bishop Lawrence's renunciation of orders,[54] the associated diocese was created and subsequently voted to reverse most of the changes made to the disassociated diocese's constitution and canons. That same date, Bishop vonRosenberg was officially installed as the national church's bishop to the associated diocese.

After the plaintiffs withdrew from the national church, the defendants claimed ownership over all of the property held by the plaintiffs, arguing the plaintiffs only held such property in trust for the benefit of the national church and its associated diocese, and that the associated diocese was entitled to control and govern the assets belonging to the plaintiffs because the plaintiffs acceded to the Dennis Canon.

## II. REAL AND PERSONAL PROPERTY

The question here is ultimately simple: what entities—the plaintiffs or the defendants—own the real and personal property at issue? I fundamentally disagree with how the lead opinion and concurrence answer that question, as we are not asked to determine the "legitimacy" of either diocese, nor are we permitted to do so by the United States Constitution or South Carolina law.

### A. Standard of Review

First, I strongly disagree with the lead opinion's statement of the standard of review. The lead opinion contends that

---

sponsored by the disassociated diocese. This is just one of several instances in which the plaintiffs claim the defendants improperly used the disassociated diocese's registered name and seal without permission.

54. Bishop Lawrence contends that he never renounced his orders.

because the plaintiffs are seeking injunctive relief, this is an equitable matter. As a result, the lead opinion finds the Court is free to take its own view of the facts.

However, by the terms of their complaint, the plaintiffs seek a declaratory judgment as to the rightful ownership, under South Carolina law, of the real, personal, and intellectual property of the disassociated diocese, the plaintiff parishes, and the trustee corporation.[55] The plaintiffs' request for injunctive relief is clearly confined to the defendants' use of the plaintiffs' names, seals, and emblems—which, as I explain further, *infra*, is ultimately a question of federal law.

"A suit for declaratory judgment is neither legal nor equitable; rather, it is determined by the nature of the underlying issue." *Sloan v. Greenville Hosp. Sys.*, 388 S.C. 152, 157, 694 S.E.2d 532, 534 (2010). Rather than looking to the relief sought, appellate courts must look to the "main purpose" of the underlying issue to determine whether the action is at law or in equity. *Verenes v. Alvanos*, 387 S.C. 11, 16, 690 S.E.2d 771, 773 (2010); *Sloan v. Greenville Cnty.*, 356 S.C. 531, 544, 590 S.E.2d 338, 345 (Ct. App. 2003).

Here, the central issue of this dispute (as succinctly put by the lead opinion) is the determination of title to real property. Therefore, the action is one at law. *See Query v. Burgess*, 371 S.C. 407, 410, 639 S.E.2d 455, 456 (Ct. App. 2006) ("Where, as here, the main purpose of the [declaratory judgment action] concerns the determination of title to real property, it is an action at law."); *see also Wigfall v. Fobbs*, 295 S.C. 59, 60, 367

55. Specifically, the opening paragraph of the plaintiffs' second amended complaint states:

Plaintiffs, by and through their respective undersigned counsel, bring this action against the Defendants seeking a declaratory judgment pursuant to §§ 15-53-10 et seq. of the South Carolina Code of Laws (1976) that they are the sole owners of their respective real and personal property in which the Defendants, The Episcopal Church ("TEC") has no legal, beneficial or equitable interest. The Plaintiffs (except for St. Andrew's Church, Mt. Pleasant) also seek a declaratory judgment that the Defendants and those under their control have improperly used and may not continue to use any of the names, styles, seals and emblems of any of the Plaintiffs or any imitations or substantially similar names, styles, seals and emblems and that the Court enter injunctions prohibiting the Defendants and those under their control from such uses pursuant to §§ 39-15-1105 et seq. and §§ 16-17-310 and 320 of the South Carolina Code of Laws (1976).

S.E.2d 156, 157 (1988) ("The determination of title to real property is a legal issue."). In an action at law tried without a jury, this Court will not disturb the trial court's findings of fact unless there is no evidence to reasonably support them. *Auto-Owners Ins. Co. v. Rhodes*, 405 S.C. 584, 593, 748 S.E.2d 781, 785 (2013). "However, an appellate court may make its own determination on questions of law and need not defer to the trial court's rulings in this regard." *Id.*

It is abundantly clear from the pleadings that the main purpose of this declaratory judgment action is the determination of title to real property. Thus, under South Carolina's jurisprudence, this is an action at law, and we must defer to the trial court's factual findings unless wholly unsupported by the evidence.

## B. First Amendment Jurisprudence

The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (stating the Establishment Clause applies to the States through the Fourteenth Amendment). Undeniably, "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). More specifically, "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Serbian E. Orthodox Diocese for the U.S. & Canada v. Milivojevich*, 426 U.S. 696, 709–10, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); *Presbyterian Church*, 393 U.S. at 447, 89 S.Ct. 601 (discussing *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728–29, 20 L.Ed. 666 (1871)); *accord Banks v. St. Matthew Baptist Church*, 406 S.C. 156, 160, 750 S.E.2d 605, 607 (2013) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)). In other words, civil courts may not inquire into matters touching on " 'theological controversy, church discipline, ecclesiastical government, or the conformity

of the members of a church to the standard of morals required of them.'" *Serbian E. Orthodox*, 426 U.S. at 713–14, 96 S.Ct. 2372 (quoting *Watson*, 80 U.S. (13 Wall.) at 733).

However, "not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment." *Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. 601; *see also Jones*, 443 U.S. at 605, 99 S.Ct. 3020 (rejecting the suggestion that the First Amendment requires states to adopt a compulsory rule of deference to religious authorities in resolving church property disputes when the dispute does not involve a doctrinal controversy). Instead, "a [s]tate may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones*, 443 U.S. at 602, 99 S.Ct. 3020 (emphasis in original) (citing *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (per curiam) (Brennan, J., concurring)).

Thus far, the Supreme Court has expressly sanctioned two constitutionally permissible approaches for resolving church disputes: the deference approach and the neutral principles of law approach. *See All Saints*, 385 S.C. at 442, 685 S.E.2d at 171. Under the deference approach, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Watson*, 80 U.S. (13 Wall.) at 727; *see also Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Emp't Opportunity Comm'n*, 565 U.S. 171, 185–86, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012). The deference approach used to be the only approach taken by courts to resolve church disputes. *All Saints*, 385 S.C. at 443, 685 S.E.2d at 171. However, as First Amendment jurisprudence developed, criticism of a pure deference approach arose because the approach "is rigid in its application and does not give efficacy to the neutral, civil legal documents and principles with which religious congregations and denominations often organize their affairs." *See, e.g., id.* at 444, 685 S.E.2d at 171.

As an alternative, in *Jones v. Wolf*, the United States Supreme Court explicitly sanctioned the neutral principles of law approach to resolving church disputes. 443 U.S. at 603, 99 S.Ct. 3020 (holding a state is constitutionally entitled to adopt the neutral principles of law approach as a means of adjudicating church disputes); *accord Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. 601 ("[T]here are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded.").

Under the neutral principles methodology, ownership of disputed property is determined by applying generally applicable law and legal principles. That application will usually include considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and [bylaws], if any), and relevant provisions of governing documents of the general church.

*Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 603 (Tex. 2014). In *Jones*, the Supreme Court explained:

The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

443 U.S. at 603–04, 99 S.Ct. 3020. At the most basic level, the neutral principles approach embodies notions of fairness, as churches—like other private and public entities—can avail

themselves of the protections of our state and local laws,[56] and therefore, should be on an equal playing field when disputes arise under those laws. As far back as 1871 in *Watson*—which was the architect of the deference approach as we know it—the United States Supreme Court acknowledged this basic principle of fairness:

> Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints. Conscious as we may be of the excited feeling engendered by this controversy, ... we enter upon its consideration with the satisfaction of knowing that the principles on which we are to decide so much of it as is proper for our decision, are those applicable alike to all of its class, and that our duty is the simple one of applying those principles to the facts before us.

80 U.S. (13 Wall.) at 714.

In *Pearson v. Church of God*, this Court first adopted the neutral principles approach. 325 S.C. 45, 478 S.E.2d 849 (1996). There, the Court articulated three general principles to assist the courts when resolving civil disputes involving a church. *Id.* at 52–53, 478 S.E.2d at 853. First, "courts may not engage in resolving disputes as to religious law, principle, doctrine, discipline, custom, or administration." *Id.* at 52, 478 S.E.2d at 853. Second, "courts cannot avoid adjudicating rights growing out of civil law," such as disputes determined by contract or property law. *Id.* at 52 & n.3, 478 S.E.2d at 853 & n.3. Third, "in resolving such civil law disputes, courts must accept as final and binding the decisions of the highest religious judicatories as to religious law, principle, doctrine, discipline, custom, and administration." *Id.* at 52–53, 478 S.E.2d at 853; *see also Jones*, 443 U.S. at 602, 99 S.Ct. 3020; *Serbian E. Orthodox*, 426 U.S. at 724–25, 96 S.Ct. 2372.

Prior to *Pearson*, this Court issued decisions resolving property matters using a purely deferential approach.[57] How-

---

**56.** Here, the plaintiffs utilized local deed recordation systems and organized as corporations under state law.

**57.** *See, e.g., Seldon v. Singletary*, 284 S.C. 148, 326 S.E.2d 147 (1985) (deferring to hierarchical authority of the church in case involving

ever, following *Pearson*'s pronouncements, South Carolina evolved into a State that exclusively applies a neutral principles approach to matters involving *secular* church disputes— and not just property disputes. *See, e.g., All Saints*, 385 S.C. at 442, 685 S.E.2d at 170 (applying neutral principles of law in disputes arising between a congregation and its denomination over title to church property and between the congregation's members over corporate control); *Pearson*, 325 S.C. at 45, 478 S.E.2d at 849 (applying neutral principles of law in a contractual pension dispute); *see also Banks*, 406 S.C. at 156, 750 S.E.2d at 605 (effectively applying neutral principles of tort law to a dispute between church trustees and the church pastor when deciding that the trustees' claims of negligence, defamation, and intentional infliction of emotional distress could be litigated in a civil court).

Under the current analysis, a court must first determine if the dispute is ecclesiastical or secular.[58] If the dispute is secular in nature, we have—until now—applied the neutral principles approach. *See id.* If the dispute is ecclesiastical in nature, we have applied the deference approach. *See Knotts v. Williams*, 319 S.C. 473, 478, 462 S.E.2d 288, 291 (1995) (finding in a dispute about the ecclesiastical leadership of a church that "the courts' function is solely limited to interpreting the final action of the church"); *accord Pearson*, 325 S.C. at 52, 478 S.E.2d at 853 (stating "courts may not engage in resolving disputes as to religious law, principle, doctrine, discipline, custom, or administration").

Only after deciding that the dispute is ecclesiastical should a court consider whether the church is hierarchical or congregational,[59] and then defer to the decision of the highest authority in that body to resolve the dispute. *See Pearson*, 325 S.C. at 53 n.4, 478 S.E.2d at 853 n.4 ("In religious organizations of a hierarchical nature, courts would interpret the final actions of

ownership and control of church property); *Adickes v. Adkins,* 264 S.C. 394, 215 S.E.2d 442 (1975) (same); *Bramlett v. Young,* 229 S.C. 519, 93 S.E.2d 873 (1956) (same).

**58.** The lead opinion agrees this is the correct starting-point in the analysis.

**59.** *See generally Md. & Va. Eldership,* 396 U.S. at 369 n.1, 90 S.Ct. 499 (Brennan, J., concurring) (defining hierarchical and congregational organizations).

the highest ecclesiastical tribunal or body. In religious organizations of a congregational nature, courts would interpret the final actions of the majority of congregations.").[60] Thus, ordinarily, if a dispute is deemed to be a secular civil dispute, the question of whether a church is hierarchical or congregational does not even factor into the analysis. *See All Saints*, 385 S.C. at 444, 685 S.E.2d at 172 ("Church disputes that are resolved under the neutral principles of law approach do not turn on the single question of whether a church is congregational or hierarchical. Rather, the neutral principles of law approach permits the application of property, corporate, and other forms of law to church disputes.").

Although the lead opinion states that it relies on this well-established framework, the lead opinion does not actually apply it. In fact, in both of their analyses, the lead opinion and the concurrence do not first consider the nature of the cause of action, instead skipping straight to making a factual pronouncement that the national church is hierarchical.[61] In so doing, both opinions persist in committing a fundamental

---

**60.** The lead opinion criticizes *All Saints*, claiming it stands for the proposition that "the 'neutral principles of law' approach require[s] that in order for a civil court to determine whether a church-related dispute could be adjudicated in that forum, the court must look **only** at state corporate and property law, ignoring the ecclesiastical context entirely." This is a gross misstatement of the legal framework created by *Pearson* and perpetuated by the *All Saints* decision, in that both opinions clearly state that South Carolina still uses deference when appropriate—just not with respect to secular civil matters.

**61.** As stated previously, I believe the lead opinion's exercise in fact-finding is wholly inappropriate under the proper "any evidence" standard of review, conveniently cast aside by the lead opinion to benefit its analysis. Under the correct standard of review, we are required to uphold the trial court's finding that the structure of the national church is ambiguous due to displaying aspects of both a hierarchical and congregational organization. In cases "where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy," the United States Supreme Court has declared that "civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy." *Md. & Va. Eldership*, 396 U.S. at 369–70 & n.4, 90 S.Ct. 499 (1970) (Brennan, J., concurring) (explaining that even when courts employ the deference approach and attempt to enforce the decision made by the highest ecclesiastical authority in a church, those courts "would have to find another ground for decision, *perhaps the application of general property law*, when identification of the relevant church governing body

analytical error: failing to first assess the nature of the dispute itself. By applying the framework in reverse order and declaring the church hierarchical as an initial matter, it is the lead opinion and concurrence themselves that imbue this dispute with ecclesiastical qualities, because the finding carries with it the implication that all decisions with respect to this dispute over property ownership flow from this leadership structure. Thus, the lead opinion and concurrence essentially gut the neutral principles approach so carefully developed since *Pearson*. Under their formulations, there will **never** be a civil law suit involving a church that can be resolved without reference to ecclesiastical doctrine, law, custom, or administration. In my view, the two opinions overrule *Pearson* and its progeny in all but name.[62]

In my opinion, the framework—properly applied—yields but one logical result. Because this is a dispute over title to

is impossible without immersion in doctrinal issues or extensive inquiry into church polity" (emphasis added)); *see also Jones*, 443 U.S. at 605, 99 S.Ct. 3020 (stating that the deference approach is inappropriate when the locus of control is ambiguous (quoting *Serbian E. Orthodox*, 426 U.S. at 723, 96 S.Ct. 2372)). Here, the record supports the trial court's finding that the national church's leadership structure is ambiguous. I contend this ambiguity provides an additional basis on which this Court should look to neutral principles of property law to resolve this dispute. *See Jones*, 443 U.S. at 605, 99 S.Ct. 3020; *cf. Serbian E. Orthodox*, 426 U.S. at 714, 96 S.Ct. 2372 ("[I]t is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in civil court.").

62. I note that until today, our precedents have conformed with the overwhelming majority of state courts (not to mention the United States Supreme Court) that would apply a neutral principles approach to this title dispute. *See, e.g., Jones*, 443 U.S. at 602, 99 S.Ct. 3020 (upholding the neutral principles approach in a property dispute); *Md. & Va. Eldership*, 396 U.S. at 367, 90 S.Ct. 499; *Diocese of Quincy v. Episcopal Church*, 383 Ill.Dec. 634, 14 N.E.3d 1245, 1258 (2014); *Masterson*, 422 S.W.3d at 602 n.6 (collecting state cases). Notably, the lead opinion does not cite any cases to support its novel analysis, and instead primarily supports its departure from well-settled law using the non-prevailing analysis contained in the dissent to a Texas state court case which resolved a church property dispute using the neutral principles approach. *See Masterson*, 422 S.W.3d at 614 (Lehrmann, J., dissenting).

property, we should apply neutral principles of South Carolina property and trust law.

## C. Application

As noted previously, the lead opinion and concurrence declare this property dispute is ecclesiastical in nature based on their factual finding that the national church is a hierarchical institution. In doing so, they rely on directives from the national church unilaterally creating trusts in the plaintiffs' properties, claiming these purported trust documents satisfy the requirements of *Jones*. This result is the exact opposite that I would reach in applying *Jones*'s neutral-principles approach.

*Jones* was a property dispute arising from a schism in a hierarchical church, in which the Supreme Court acknowledged the ability of civil courts to resolve most church-based property disputes using deeds, state statutes, the local church charters, and the national church's constitution. There, the Supreme Court explained:

> Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Jones*, 443 U.S. at 603–04, 99 S.Ct. 3020. I agree with the lead opinion that *Jones* offers religious institutions the ability to order their affairs and structure their property ownership through "appropriate" (i.e., secular) channels. However, the lead opinion and I diverge at the point in its analysis where it fails to recognize *Jones*'s mandate that any such undertaking must occur in a legally binding manner:

> The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time

before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, ***provided it is embodied in some legally cognizable form.***

*Jones*, 443 U.S. at 606, 99 S.Ct. 3020 (emphasis added). The lead opinion and concurrence not only misinterpret this passage from *Jones*, but ultimately dispense with it.

First, the lead opinion and concurrence extrapolate a requirement that any state law affecting a church's property rights may only be accomplished with minimal burdens on the national religious body. More accurately, the *Jones* Court was merely stating that only minimal efforts would be required on the part of national church organizations to bring their ownership interests within the ambit of state law and ultimately, to avoid litigation over property ownership in the event of a doctrinal dispute or schism. *Jones* did not, as the lead opinion suggests, create a requirement that states amend their property laws so as to only minimally burden national religious organizations as they are attempting to structure their affairs with respect to property ownership in their member dioceses. Further, contrary to the lead opinion's implication, South Carolina law does not place undue burdens on religious bodies seeking to create trusts in this State. Our general trust law is similar to that of every other jurisdiction in this country, and therefore, it requires only minimal effort to comply with South Carolina trust law.

Next, the lead opinion and concurrence dismiss completely the requirements that trust documents—which "ensure ... that the faction loyal to the hierarchical church will retain the church property"—must be adopted before the dispute begins and be *"embodied in some legally cognizable form"* in order to be enforceable under state law. To me, however, this language is the defining language of the *Jones* opinion with

respect to this suit, and why the plaintiffs necessarily must prevail.

The lead opinion finds that not only is accession to the Dennis Canon not required, but that the defendants were not required to take any further action under South Carolina law to ensure the validity of these "trusts." Remember that eight parishes neither acceded to the Dennis Canon nor took any other legal action with respect to their property outside of membership in the national church. Thus, the lead opinion finds trusts existed with respect to all of the plaintiff parishes merely because these parishes were members in a voluntary organization where that organization has unilaterally claimed ownership in their property.

By giving credence to this standard built only on "the national church said so," the lead opinion effectively ignores *Jones* altogether. *Jones* explicitly suggests state courts use "well-established concepts of trust and property law familiar to lawyers and judges" to resolve these disputes, "thereby promis[ing] to free civil courts completely from entanglement in questions of religious doctrine, policy, and practice." 443 U.S. at 603–04, 99 S.Ct. 3020. In fact, in *Jones*, the United States Supreme Court remanded the case to Georgia to determine the property's ownership by applying Georgia's long-established property law. *Id.* at 609–10, 99 S.Ct. 3020. Yet, in direct contravention of *Jones*'s directive to use state principles of property and trust law ingrained in the collective knowledge of our bench and bar to resolve church property disputes, the lead opinion instead does exactly what *Jones* warns against and dives headfirst into religious matters.

Under South Carolina law, there are only two ways to create a trust: either expressly or constructively. As will be explained, *infra*, it is my opinion that the defendants accomplished neither in this case.

### 1. Express Trusts

The South Carolina Trust Code [63] provides that an express trust may be created by either the "transfer of property to another person as trustee," or by a "written declaration signed by the owner of property that the owner holds identifiable

---

**63.** S.C. Code Ann. §§ 62-7-101 to -1106 (2009 & Supp. 2016).

property as trustee." S.C. Code Ann. § 62-7-401(a)(1); *see also All Saints*, 385 S.C. at 449, 685 S.E.2d at 174. However, it is axiomatic that the trust is created only if, *inter alia*, the settlor indicates an intention to create the trust. S.C. Code Ann. § 62-7-402(a)(2); *State v. Parris*, 363 S.C. 477, 482, 611 S.E.2d 501, 503 (2005). Moreover, to satisfy the statute of frauds, "a trust of real property … must be proved by some writing signed by the party creating the trust." S.C. Code Ann. § 62-7-401(a)(2); *Whetstone v. Whetstone*, 309 S.C. 227, 231–32, 420 S.E.2d 877, 879 (Ct. App. 1992) (citing *Beckham v. Short*, 298 S.C. 348, 349, 380 S.E.2d 826, 827 (1989)). Proof of express trusts must be made by clear and convincing evidence. *Price v. Brown*, 4 S.C. 144 (1873); *cf.* S.C. Code Ann. § 62-7-407 (stating that the burden of persuasion for oral trusts is clear and convincing evidence).

In examining the efficacy of the Dennis Canon, I would find that it does not satisfy the requirements for creating an express trust under South Carolina law. First, there was no transfer of title. In fact, the defendants stipulated at trial that the property in dispute is (and has always been) titled in the plaintiff parishes' names. Thus, in order to create an express trust, the plaintiff parishes—as the title-holders—must have made a written, signed statement of intent to transfer their property into a trust for the benefit of the national church. *Cf. Turbeville v. Morris*, 203 S.C. 287, 26 S.E.2d 821 (1943) (examining the document creating a purported trust in order to ascertain which church faction was the beneficiary of the trust). However, the Dennis Canon is merely the *national church's* statement of interest in the plaintiff parishes' properties. "It is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another." *All Saints*, 385 S.C. at 449, 685 S.E.2d at 174. Thus, I believe the only conclusion this Court could reach under South Carolina law is that the Dennis Canon is not a basis for asserting legal title to the plaintiffs' properties, nor does it create an express trust over the those properties. *Id.* (holding that the Dennis Canon does not create an express trust pursuant to South Carolina property law); *cf. Jones*, 443 U.S. at 606, 99 S.Ct. 3020 (stating that civil courts must give effect to deeds and trust documents executed by the general church "provided [the documents are] embodied in some *legally cognizable* form" (emphasis added)).[64]

With respect to the writing requirement, the defendants argue that twenty-eight of the thirty-six plaintiff parishes "made express promises in their governing documents to comply with the [n]ational [c]hurch's rules *after* those rules had been amended to include the Dennis Canon in 1979," and that "[t]hese writings fulfilled the writing and signature requirements of South Carolina's Trust Code." [65] I would reject this argument for two reasons.

First, the twenty-eight parishes that made this alleged express promise at most merely acceded to the national church's constitution and canons. However, their accession did not include a transfer of title in a form recognized under South Carolina law. Moreover, like the two prior disassociations—from the Church of England during the Revolutionary War, and from the national church during the Civil War—the plaintiffs associated and disassociated with the national church on their own terms, and at no point made a title transfer recognizable under South Carolina law. Thus, it is my opinion that the parishes' accession to the national church's rules does not constitute clear and convincing evidence that they intended to place their property in trust (either revocable or irrevocable) for the national church. *See Price*, 4 S.C. at 144 (requiring clear and convincing evidence of intent to place property in beneficial use for another).[66]

---

**64.** For this reason, I believe the lead opinion errs in reexamining our holding in *All Saints.* I am just as firmly convinced now—as the Court was in 2009—that the Dennis Canon did not create an express trust under South Carolina law and that *All Saints* was correctly decided. To the extent the lead opinion contends that it is not seeking to overrule the result of *All Saints*, its analysis of the issue does not comport with this assertion.

**65.** A majority of the Court agrees with my analysis up to this point, finding we must apply neutral principles of South Carolina property law to resolve this dispute. However, on this argument, Chief Justice Beatty and I part ways. He agrees with the defendants' argument, finding "the Dennis Canon had no effect until acceded to in writing by the [twenty-eight] individual parishes." I explain, *infra*, why I respectfully disagree with him. Essentially, I do not believe mere accession meets the requirements of South Carolina law for the creation of a trust.

**66.** I note that the defendants ask that we resolve this title issue by deciding whether the parties complied with the rules set forth in their

## 2. Constructive Trusts

Likewise, I would find that constructive trusts did not arise with respect to the property at issue.

"A constructive trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding the legal title." *Lollis v. Lollis*, 291 S.C. 525, 529, 354 S.E.2d 559, 561 (1987); *see also Carolina Park Assocs., L.L.C. v. Marino*, 400 S.C. 1, 6, 732 S.E.2d 876, 879 (2012). "A constructive trust results from fraud, bad faith, abuse of confidence, or violation of a fiduciary duty which gives rise to an obligation in equity to make restitution." *Lollis*, 291 S.C. at 529, 354 S.E.2d at 561; *Gordon v. Busbee*, 397 S.C. 119, 141, 723 S.E.2d 822, 834 (Ct. App. 2011). "In order to establish a constructive trust, the evidence must be clear, definite, and unequivocal." *Lollis*, 291 S.C. at 530, 354 S.E.2d at 561.

---

respective constitutions and canons—such as the Dennis Canon. While we *can* decide that the Dennis Canon (and other governing documents) are not legally binding trust documents because they do not comport with the secular formalities required by South Carolina law to impose a trust on the settlor's property, it would be completely improper under settled First Amendment jurisprudence for this Court to resolve this real property title issue by delving into the ecclesiastical doctrine of the national church. *See, e.g., Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. 601 ("States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.").

The concurrence suggests the Court does not have enough information to determine, applying long-standing state property principles, the statuses of the titles of the various properties, and that at best, a remand would be required to allow the parties to litigate the issue. However, this flies in the face of basic appellate principles. *Cf. Odom v. State*, 337 S.C. 256, 261, 523 S.E.2d 753, 755 (1999) (holding successive PCR applications are disfavored because they allow the applicant more than one bite at the apple). Here, each plaintiff painstakingly entered into evidence information about their individual titles. In response, the defendants did not attempt to refute or distinguish any of the individual plaintiff's title information, but instead proceeded entirely on ecclesiastical theory, i.e., that they owned *all* of the disputed properties, without exception, because "the national church said so." In my view, the plaintiffs clearly established each of their titles under our state's property, trust, and corporate law, and the defendants failed to grapple with the implications of those neutral principles of state law, to their detriment.

According to the testimony adduced at trial, the plaintiffs obtained their properties through (1) grants from current or prior parishioners; or (2) purchase with their own funds, and not funds from the national church. The defendants made no effort to demonstrate that the parishioner grants were intended to be grants to the national church or the local diocese affiliated with the national church. In fact, the deed granting Camp St. Christopher to the trustee corporation expressly names the trustee corporation as beneficiary due to its "good works." Therefore, I would find no "clear, definite, and unequivocal" evidence of fraud on the part of the plaintiffs in acquiring title to the properties.

The defendants argue Bishop Lawrence and the disassociated diocese acted deceptively and contrary to the national church's interests in issuing the quitclaim deeds, and that their amendment of the disassociated diocese's corporate charter was *ultra vires*. In the defendant's view, this provides evidence of fraud sufficient to make constructive trust appropriate in this situation. I disagree.

Essentially, the defendants ask that we determine the plaintiffs lacked the canonical authority to issue the quitclaim deeds and amend their corporate charters. However, the Supreme Court has expressly forbidden courts from making such determinations. *See Md. & Va. Eldership*, 396 U.S. at 370, 90 S.Ct. 499 (Brennan, J., concurring) (stating that even in applying the deference approach, "civil courts do not inquire whether the relevant church governing body has power under religious law to control the property in question. Such a determination, unlike the identification of the governing body, frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine.").

Rather, we may only determine whether the plaintiffs had legal authority and followed the appropriate steps under South Carolina's corporate law to issue the quitclaim deeds and amend their corporate charters. I would find the plaintiffs had the legal authority and complied with the legal requirements

to effectuate those changes, and the defendants do not argue otherwise to this Court. Remember, the national church never revoked Bishop Lawrence's authority over the disassociated diocese while the diocese was issuing the quitclaim deeds or amending its diocesan constitution, canons, and corporate purpose.[67] Indeed, the purported acceptance of Bishop Lawrence's renunciation of orders occurred after the amendments to the various constitutions and deeds were executed and publicly recorded. To me, this constitutes overwhelming evidence of the national church's acquiescence to the changes in the plaintiffs' corporate forms, constitutions, and bylaws.

Further, all actions by Bishop Lawrence were undertaken using the correct legal channels and proper corporate formalities under South Carolina law. Not only was Bishop Lawrence clearly acting on the national church's behalf at the time, but the record shows that the national church was fully aware of what Bishop Lawrence's intentions were when he was made a bishop and that he was executing these deeds by the authority vested in him by the national church.[68] Thus, whether or not trusts were created—which I contend they were not—the current status of the property is that it has been deeded back to the plaintiff parishes. That these various corporate amend-

---

**67.** Likewise, the national church did not assert the plaintiff parishes lacked the authority to de-accede.

**68.** This is in stark contrast to the facts underlying the recent California case cited favorably by the concurrence. In *Diocese of San Joaquin v. Gunner*, 246 Cal.App.4th 254, 202 Cal.Rptr.3d 51 (2016), the California Court of Appeals applied neutral principles of state corporate law and held the attempts to amend the breakaway diocese's articles of incorporation and transfer the property away from the national church were ineffective. However, importantly, in that case, the bishop of the breakaway diocese had already been deposed by the national church one month before attempting to amend the diocesan articles of incorporation under state law, and two months before attempting to transfer the disputed property titles to the new corporation formed by the breakaway diocese. This, of course, was not the case here, as Bishop Lawrence retained his full secular and religious authority over the disassociated diocese until well after all of the amendments were adopted and quitclaim deeds were issued. Thus, in my view, the analysis in *Gunner* supports my position, not the concurrence's. *See, e.g., id.* at 63, 64 (including section titles to the court's opinion stating "Deference to the [national c]hurch does not resolve the dispute" and "The property was not held in trust for the [national c]hurch").

ments and deeds are embodied in a "legally cognizable form" is irrefutable.

The lead opinion utterly fails to account for the national church's subsequent action of quitclaiming the deeds back to the plaintiff parishes. Even though the lead opinion and concurrence declare this dispute "ecclesiastical," the fact remains that Bishop Lawrence—acting with the full authority of the national church—legally transferred the deeds to the plaintiffs, and the deeds continue to be held by the plaintiffs. No level of deference to the national church at this point can change this. Thus, it remains unclear what legal basis the lead opinion is using to declare the national church the rightful owner of the plaintiffs' property.

While I would decline to impose a constructive trust on the plaintiffs' properties, I would additionally find that the property at issue is now titled in the plaintiffs' names by its bishop's actions.

### D. Conclusion as to Title of Plaintiff Parishes' Property

By applying neutral principles of South Carolina's long-standing property law, I would find that the national church has no "legally cognizable" interest in the plaintiff parishes' properties. *See Jones*, 443 U.S. at 606, 99 S.Ct. 3020; *Md. & Va. Eldership*, 396 U.S. at 367–68, 90 S.Ct. 499 (dismissing the appeal for want of a federal question after the state court resolved a church property dispute by examining the deeds to the properties, the state statutes dealing with implied trusts, and the relevant provisions in the church's constitution pertinent to the ownership and control of church property, and found that nothing in those documents gave rise to a trust in favor of the general church). Despite the lead opinion's and concurrence's statements to the contrary, this is not an instance where a "property right follows as an incident from decisions of the church custom or law on ecclesiastical issues." *See Kedroff*, 344 U.S. at 120–21, 73 S.Ct. 143. Rather, the properties at issue here are titled in the plaintiff parishes' names (and some have been for over two hundred years), and the majority is permitting the defendants to circumvent South Carolina law in authorizing this title-takeover, albeit not agreeing on the rationale for doing so.

Let us not forget the defendants stipulated that the real property at issue is titled in the plaintiff parishes' names, and that the *plaintiff parishes "are not members of the [national c]hurch."* (emphasis added). Aside from the fact that a majority of the parishes acceded to the Dennis Canon in some form or another—which I would find was not a legally binding action to impose a trust under South Carolina law—eight parishes **never acceded** in any form to either the national church's Dennis Canon or the diocesan version of the Dennis Canon created by the now-disassociated diocese.[69] Under the lead opinion's formulation, these parishes, like all of the other plaintiff parishes, must surrender their lawful titles to the national church for the mere fact that the national church is a religious organization. This is extremely troubling. The lead opinion offers no explanation or legal basis (and I know of none) that allows for an organization—religious or otherwise— to strip an individual, business, or charitable organization of title ownership because that organization unilaterally declares ownership in such property. However, the ramifications do not

---

69. The concurrence takes Chief Justice Beatty, Justice Kittredge, and me to task for giving any credence to the fact that eight of the thirty-six plaintiff parishes did not accede to the Dennis Canon whatsoever. I first point out the national church contended in both its motion to reconsider and its brief to this Court that twenty-eight of the thirty-six plaintiff parishes "made express promises in their governing documents to comply with the [n]ational [c]hurch's rules after those rules had been amended to include the Dennis Canon in 1979," and that "[t]hese writings fulfilled the writing and signature requirements of South Carolina's Trust Code." (emphasis in original). While the argument only addresses the twenty-eight churches that allegedly acceded, it raises a direct question about the other eight churches, implying that they are somehow different from the twenty-eight who "made express promises." Second, and perhaps more importantly, the concurrence incorrectly construes our holding in *I'On L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000), with regards to issue preservation as it relates to additional sustaining grounds. A prevailing party need never raise an additional sustaining ground below, nor secure a ruling on it, in order for the issue to be preserved for appellate review. *See* Rule 220(c), SCACR (providing appellate courts may affirm the judgment of a lower court based on any ground appearing in the record). Undoubtedly, it is more prudent to raise an additional sustaining ground in the appellate brief, as it draws the appellate court's attention to the matter and encourages it to exercise its discretion to address the issue. However, explicitly raising the issue is not a prerequisite for the court to affirm the decision of the lower court on an alternative ground. *See* Rule 220(c), SCACR.

end there. The rationale underlying the lead opinion would place many heretofore validly-titled properties in legal limbo. If I were a member of a governing body of a religiously-affiliated hospital, for example, I would be gravely concerned, as the lead opinion declares today that different rules apply to religious organizations with respect to corporate organization and property ownership in this State.

In my opinion, because it would dispense with the ancient formalities of property and trust law and the prior esteem with which courts in this state afforded such formalities, the lead opinion's rationale would dramatically alter our property law as we know it. Accordingly, I would affirm the trial court's decision that the defendants do not have an interest in the plaintiff parishes' real properties.

### E. Camp St. Christopher

In some respects, the title to Camp St. Christopher presents the Court with a more straightforward analysis, in that the Dennis Canon, by its own terms, does not apply. Specifically, the Dennis Canon states, *inter alia*, " All real and personal property *held by or for the benefit of any Parish, Mission or Congregation* is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located." (emphasis added). It is undisputed the trustee corporation holds title in fee simple to Camp St. Christopher, and that it does so for the benefit of the disassociated diocese, rather than any individual parish, mission, or congregation. Because the trustees did not accede to the Dennis Canon, there is no basis in South Carolina trust law for the national church to claim an ownership interest in Camp St. Christopher. Moreover, although the trustee corporation's initial bylaws stated that it would carry out its duties under the authority of the national church's constitution and canons, the trustees later took steps, using appropriate corporate formalities, to amend the bylaws and remove all references to the national church *before the national church revoked Bishop Lawrence's authority*. Accordingly, similar to the other plaintiff parishes', I would declare title to Camp St. Christopher in the trustee corporation, held for the benefit of the disassociated diocese, just as the original deed conveyed the property.

## III. INTELLECTUAL PROPERTY

Next, the plaintiffs assert their service marks are validly registered under state law and that they own the right to use the seals and symbols registered with the state. As a result, the plaintiffs claim the defendants' use of the plaintiffs' marks amounts to service mark infringement. The defendants take the position that the plaintiffs' service marks are too similar to the defendants' federally-registered service marks, and that because the defendants registered their marks with the United States Patent and Trademark Office (USPTO), the Lanham Act [70] expressly preempts state law with respect to the validity of the plaintiffs' marks.

I would narrowly affirm the trial court's finding that the plaintiffs' service marks are validly registered under state law. However, because there is already a pending federal case involving the applicability of the Lanham Act to these exact marks, I would defer to the federal courts regarding the applicability of federal copyright law.

### A. *Standard of Review*

"Actions for injunctive relief are equitable in nature." *Grosshuesch v. Cramer*, 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005). "In an action in equity tried by a judge alone, the appellate court may find facts in accordance with its view of the preponderance of the evidence." *Goldman v. RBC, Inc.*, 369 S.C. 462, 465, 632 S.E.2d 850, 851 (2006). "However, this broad scope of review does not require an appellate court to disregard the findings below or ignore the fact that the trial judge is in the better position to assess the credibility of the witnesses." *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). Moreover, appellants are not relieved of their burden of convincing an appellate court that the trial court committed an error in its findings. *Id.* at 387–88, 544 S.E.2d at 623.

### B. *Merits*

Pursuant to federal law,

---

**70.** 15 U.S.C. §§ 1051–1141n (2006).

Any registration issued under the [Lanham Act] ... and owned by a party to an action shall be admissible as evidence and *shall be prima facie evidence* of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and *of the registrant's exclusive right to use the registered mark in commerce* on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein.

15 U.S.C. § 1115(a) (emphasis added). Moreover,

The ownership by a person of a valid registration under [the Lanham Act] ... shall be a complete bar to an action against that person, with respect to that mark, that—

(A) is brought by another person under the common law or a statute of a State; and

(B)(i) seeks to prevent dilution by blurring or dilution by tarnishment; or

(ii) asserts any claim of actual or likely damage or harm to the distinctiveness or reputation of a mark, label, or form of advertisement.

15 U.S.C. § 1125(c)(6).[71]

"In the absence of an express congressional command, state law is preempted if the law actually conflicts with federal law,

---

71. South Carolina law provides:

The secretary shall cancel from the register, in whole or in part: ... (3) a registration concerning which a court of competent jurisdiction finds that the: ... (f) *registered mark is so similar, as to be likely to cause confusion or mistake or to deceive, to a mark registered by another person in the [USPTO] before the date of the filing of the application for the registration by the registrant under this article, and not abandoned*; however, if the registrant proves that the registrant is the owner of a concurrent registration mark in the [USPTO] covering an area including this State, the registration under this article may not be canceled for that area of the State....

S.C. Code Ann. § 39-15-1145(3)(f) (Supp. 2016) (emphasis added). Similarly,

A mark by which the goods or services of an applicant for registration may be distinguished from the goods or services of others may not be registered if the mark: ... (5) consists of a mark which: ... (b) when used on or in connection with the goods or services of the applicant is primarily geographically descriptive or deceptively misdescriptive of them....

S.C. Code Ann. § 39-15-1110(A)(5)(b) (Supp. 2016).

or if federal law so thoroughly occupies the legislative field as to make reasonable the inference that Congress has left no room for the states to supplement it." *City of Cayce v. Norfolk S. Ry. Co.*, 391 S.C. 395, 401, 706 S.E.2d 6, 8 (2011). Under the Lanham Act, the USPTO must refuse to grant a subsequent mark if the "dominant element" of the subsequent mark is already registered in a previous mark. *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1341–45 (Fed. Cir. 2004). Further, there are two "key considerations" in determining the dominant element of the previously-registered mark: (1) the similarities between the names of the previous and subsequent trademarks, and (2) the similarities between the previously and subsequently trademarked goods. *Id.* at 1341–42.

### C. Conclusion as to Service Marks

I would find the trial court failed to address the effect, if any, of the Lanham Act on the plaintiffs' claims for service mark infringement. However, because there is a pending federal case filed by Bishop vonRosenberg addressing the same issue, I would decline to address the effect of federal law on the parties' service marks. Thus, I would narrowly affirm the trial court's determination that the plaintiffs' marks are validly registered under South Carolina law, and would leave the application of the Lanham Act to the pending federal case.

#### CONCLUSION

The lead opinion in this case is nothing less than judicial sanction of the confiscation of church property masquerading as an attempt to promulgate a new deference rule for determining title in this matter. With no discussion of why the neutral principles of law approach to resolving church title determinations should be abandoned by the State of South Carolina, the lead opinion advocates overruling a framework that has heretofore taken the courts out of ecclesiastical controversies, instead encouraging the Court to devolve to the civil court the authority to undo centuries of well-settled church titles by judicial fiat. Such an opinion, had it obtained the support of a majority of this Court, would have been a crushing blow to centuries of carefully crafted and well-reasoned South Carolina law.

Aside from the fact that I do not believe there were ever any legal trusts created with respect to the property at issue, the simple fact is that the national church, for whatever reason, never acted to take away Bishop Lawrence's legal authority to act for it and the disassociated diocese. Under the authority granted to him by the national church, Bishop Lawrence legally transferred the plaintiffs' property back to them. Thus, to the extent the lead opinion relies on deference to confiscate the plaintiffs' property, that concept cannot overcome the essential problem that the national church itself deeded the property back to the plaintiffs.

Further, many of the plaintiff parishes established their corporate existence under South Carolina corporate law or by legislative charter years before the Dennis Cannon was adopted. Additionally, after *Jones*, all of the plaintiff parishes and the disassociated diocese made sure that they were organized as corporations under South Carolina law. None of these church corporations renounced or limited their ability to amend their charters and bylaws after initial adoption. With a stroke of a pen, the majority vitiates South Carolina's charitable corporation law and invalidates all of the plaintiffs' duly adopted corporate documents.

Because I cannot find any legal basis to support the majority's decision in this case, I would affirm the decision of the trial court. I respectfully dissent.[72]

---

72. As I stated at the outset, this is unfortunately a difficult case leading us to five different, strongly-held opinions. Because we all write separately, my summary of my understanding of the Court's holdings is as follows. A majority of the Court—consisting of Chief Justice Beatty, Justice Kittredge, and me—agree that *Pearson* and *All Saints* (and their progeny) remain good law in this state, and that in secular church disputes, our state courts should apply neutral principles of law to resolve the case. As it relates to this particular case, the same majority would find this is a secular church dispute, and the Court must therefore apply longstanding trust law to resolve the questions before us. I would find the parties' actions did not comply with the formalities required to create a trust in this state. In short, I believe the parties did not embody their intentions to create a trust in favor of the defendants in a "legally cognizable form." Justice Kittredge would find the parties created a revocable trust in favor of the national church, but the plaintiffs later took steps to revoke their accession to the trust. Therefore, both Justice Kittredge and I would declare all of the disputed titles in favor of the individual plaintiffs, with no trust formed in favor of the defendants. However, we are in the minority, because a different

majority of the Court—consisting of Chief Justice Beatty, Justice Hearn, and Acting Justice Pleicones—would reverse the trial court and transfer title of all but eight of the plaintiffs' properties to the defendants. While Justice Hearn and Acting Justice Pleicones would do so because they believe this is an ecclesiastical dispute and the Court must therefore defer to the national church's decision on the matter, Chief Justice Beatty would do so because he believes all but eight of the plaintiffs acceded to the Dennis Canon in a manner recognizable under South Carolina's trust law. Thus, the result reached on title is: 1) with regard to the eight church organizations which did not accede to the Dennis Canon, Chief Justice Beatty, Justice Kittredge, and I would hold that title remains in the eight plaintiff church organizations; 2) with regard to the twenty-eight church organizations which acceded to the Dennis Canon, a majority consisting of Chief Justice Beatty, Justice Hearn, and Acting Justice Pleicones would hold that a trust in favor of the national church is imposed on the property and therefore, title is in the national church; and 3) with regard to Camp St. Christopher, Chief Justice Beatty, Justice Hearn, and Acting Justice Pleicones would hold title is in the trustee corporation for the benefit of the associated diocese, whereas Justice Kittredge and I would hold that the trustee corporation holds title for the benefit of the disassociated diocese.

As to the second issue on appeal, involving the plaintiffs' claims for service mark infringement, Chief Justice Beatty, Justice Kittredge, and I would find the marks are validly registered under state law, but leave the ultimate resolution of the parties' conflicting claims to the pending federal case.